DANIEL L. KELLER (SBN 191738)
**KELLER, FISHBACK & JACKSON LLP**
28720 Canwood Street, Suite 200
Agoura Hills, CA 91301
Telephone:  818.342.7442
Facsimile:   818.342.7616
Email: dkeller@kfjlegal.com

STEPHEN J. FEARON, JR. (subject to *pro hac vice*)
PAUL V. SWEENY (subject to *pro hac vice*)
**SQUITIERI & FEARON, LLP**
305 Broadway, 7th Fl.
Telephone: (212) 421-6492
Facsimile: (212) 421-6553
Email: stephen@sfclasslaw.com
Email: paul@sfclasslaw.com

**Attorneys for Plaintiffs and the Proposed Class**

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| JIM CLEMMENS, TERRI HERNANDEZ, and MARIE TOUSSAINT, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>vs.<br><br>AMERICAN HONDA MOTOR COMPANY, INC.,<br><br>Defendant. | Case No.:<br><br>**CLASS ACTION COMPLAINT FOR DAMAGES**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiffs Jim Clemmens, Terri Hernandez, and Marie Toussaint ("Plaintiffs"), on behalf of themselves and all other similarly situated members of the below-defined national and state classes they respectively seek to represent (collectively, the "Class"), bring this action against Defendant American Honda Motor Company, Inc. ("Honda"), based upon personal knowledge as to the factual allegations pertaining to themselves, and based upon information and belief and the investigation made by their undersigned attorneys as to all other matters, as follows:

**NATURE OF THE ACTION**

1.    Plaintiffs bring this action individually and on behalf of a class of similarly situated owners and lessees who purchased or leased the following vehicles in all model years from 2013 to the present (collectively, the "Class Vehicles"):

- The Acura MDX in White Diamond Pearl paint (NH-603P);
- The Honda Odyssey in White Diamond Pearl paint (NH-603P) or Taffeta White paint (NH-578);
- The Honda Pilot in Taffeta White paint (Paint Code NH-578);
- The Honda Fit in White Orchid Pearl or Bellanova White paint (Paint Code NH-788P); and
- The Honda HR-V in White Orchid Pearl or Bellanova White paint (Paint Code NH-788P).[1]

2.    The Class Vehicles all suffer from a paint defect which causes the Class Vehicles' white paint to inevitably fail, peel, delaminate (that is, the separate paint layers separate due to adhesion issues), bubble, and flake (the "Paint Defect").

3.    The Paint Defect existed in latent form when Honda manufactured the vehicles and when Plaintiffs purchased the vehicles, but as demonstrated by innumerable consumer complaints, the Paint Defect will invariably manifest itself during the reasonably expected life of the Class Vehicles owned by Plaintiffs and the Class, causing paint failure, peeling, delamination, bubbling, and flaking.

---

[1]  Plaintiffs reserve the right to amend their definition of Class Vehicles to include other Honda-manufactured vehicles with the same Paint Defect.

4.    The Paint Defect stems from a defect in the paint itself; a defect in the paint when applied to the Class Vehicles' exterior; and/or a defect in Honda's manufacturing process, including the complexities in using "three-stage" white paint to give the Class Vehicles their pearlescent or metallic finish.

5.    As detailed below, at all relevant times (late 2012 to the present based on the time Honda began selling 2013 Class Vehicle models), Honda has been fully aware of the importance customers place on the exterior appearance of vehicles. At all relevant times, Honda has also been aware of the Paint Defect based on internal testing, substantially similar paint problems with other Honda vehicle models, countless consumer complaints, and at least one other substantially similar class action lawsuit filed in Canada, which Honda's affiliate settled in 2022 for upwards of $27 million in available relief.

6.    Honda has exclusive knowledge of, and has been in exclusive possession of, information pertaining to the Paint Defect, which was material to Plaintiffs and Class members, who could not reasonably know of the Paint Defect. Under all circumstances, Honda had a duty to disclose the latent Paint Defect at the point of sale of the Class Vehicles.

7.    Despite that knowledge and duty, Honda has repeatedly failed to disclose and even actively concealed the Paint Defect from Class members and the public, and continued to market the Class Vehicles as luxurious, stylish, high-quality, and high-value and value-retaining vehicles which, because of the Paint Defect, they are not.

8.    In 2019, faced with a deluge of complaints about the Paint Defect, Honda finally acknowledged the issue and implemented various Technical Service Bulletins ("TBS(s)") extending the warranties on a subset of Class Vehicles' to cover repairs of the Paint Defect.

9.    As detailed below, Honda's  warranties and extended warranties failed to provide an adequate remedy to the Class because the warranties: (1) were provided without  adequate  notice  to  Class  Vehicle  owners  whose  latent  Paint  Defect  had

manifested; (2) provided no relief to many owners and lessees of excluded Class Vehicles; (3) provided no relief to owners and lessees of Class Vehicles' whose Paint Defect had not visibly manifested; (4) were arbitrarily and improperly honored; and (5) and the repairs provided were inadequate, did not remediate the Paint Defect, and did not restore the Class Vehicles to their bargained-for value. Moreover, with the current expiration of its inadequate warranty remedies, Honda has refused, and continues to refuse, to provide repairs or any other meaningful remedy to those who have suffered economic harm because of the Paint Defect.

10. Automakers paint vehicles for two purposes: (a) to enhance aesthetics (color, gloss, and appearance); and (b) to provide necessary functionality (chemical and corrosion-resistance to protect the body of the vehicle). If any of these purposes in selecting material and painting the vehicle is compromised, then the value of the vehicle is greatly diminished and a integral component of the car will likely fail, causing further damage in the form of rust and/or corrosion.

11. The condition of the paint on the body of a motor vehicle is widely recognized in the automotive industry as a factor affecting the value of the vehicle.[2] This is because "[t]he appearance (color, gloss, and texture) of the surface [of the vehicle] significantly affects a customer's perception of product quality."[3] In addition, "customer expectations for the attributes given by the appearance of coatings continue to increase as manufacturers compete to provide surfaces that offer enhanced surface characteristics."[4]

12. The Paint Defect thus decreases the value of the Class Vehicles, forcing owners/lessees of the Vehicles to either live with the problems caused by the Defect or spend significant money—or hope that Honda will cover the cost—to have the Class

---

[2]  *See, e.g.*, NAAA Vehicle Condition Grading Scale, https://www.naaa.com/standards/vehicle_gradingscale.pdf; Ed Grabianowski, *How Kelley Blue Book Works*, HowStuffWorks.com (Nov. 21, 2005), http://auto.howstuffworks.com/buying-selling/kelley-blue-book4.htm.

[3]  Nelson K. Akafuah, *et al.*, *Evolution of the Automotive Body Coating Process—A Review*, MDPI (June 13, 2016), p. 20, http://www.mdpi.com/2079-6412/6/2/24.

[4]  *Id.*

Vehicles repainted. Even then, repainting an impacted panel does not cure the Paint Defect because the remaining parts of the Class Vehicle still suffer from the latent Paint Defect. Moreover, repainting the Class Vehicles results in a cosmetic defect that permanently decreases the Class Vehicle's value.

13. As a direct and proximate result of Acura's deceit regarding, and failure to disclose, the Paint Defect, Plaintiffs and Class members: (1) overpaid for the Class Vehicles because the Paint Defect significantly diminishes the value of the Class Vehicles; (2) have Class Vehicles that suffer premature unsightly paint failures; and (3) must expend significant money to have their Class Vehicles (inadequately) repaired and repainted.

14. Plaintiffs and Class members have purchased and leased Class Vehicles that they would not otherwise have purchased or leased, or would have paid less for, had they known of the Paint Defect at the point of sale. Plaintiffs and Class members have consequently suffered ascertainable losses and actual damages because of Honda's unlawful conduct.

15. Plaintiffs, individually and on behalf of all others similarly situated, bring claims against Honda for: (1) violating California's Unfair Competition Law; (2) violating California's False Advertising Law; (3) violating California's Consumers Legal Remedies Act (injunctive relief); (4) violating the Pennsylvania Unfair Trade Practices and Consumer Protection Law; (5) violating the New Jersey Consumer Fraud Act; (6) breach of express warranty; (7) fraudulent concealment, and (8) unjust enrichment. Plaintiffs and Class members seek restitution, actual and/or compensatory damages, and equitable relief, among other forms of relief (as alleged herein).

## **PARTIES**

**A.    Plaintiffs**

16. Plaintiff Jim Clemmens is a resident of Baltimore, Maryland and is a citizen of Maryland. Mr. Clemmens owns a 2016 Acura MDX in White Diamond Pearl paint.

17. Plaintiff Terri Hernandez is a resident of Chula Vista, California and is a

citizen of California. Ms. Hernandez owns a 2017 Acura MDX in White Diamond Pearl paint.

18.  Plaintiff Marie Toussaint is a resident of Haverstraw, New York and is a citizen of New York. Ms. Toussaint owns a 2014 Acura MDX in White Diamond Pearl paint.

**B.    Defendant**

19.  Honda is a California corporation with its principal place of business in Torrance, California.

20.  Honda is the United States sales and marketing subsidiary of, and is wholly owned by, Honda Motor Company, Ltd, a Japanese corporation, with its principal place of business at 2-1-1, Minami-Aoyama, Minato-Ku, Tokyo 107-8556 Japan. Honda is responsible for designing, manufacturing, distributing, marketing, selling, and servicing Acura and Honda vehicles in the United States, including the Class Vehicles.

21.  From its California headquarters, Honda's management oversaw the design, manufacturing, distribution, marketing, sale, and service of the Class Vehicles throughout the United States.

22.  Honda's sales and marketing leadership, as well as its accounting, financial, and legal departments, are all based in its California headquarters. Furthermore, Honda's marketing, sales, and financial documents were created and are located at its California headquarters. Honda created and/or authorized the false and misleading representations and omissions from California.

23.  Honda's substantial participation in designing, manufacturing, distributing, marketing, and selling the Class Vehicles from its California headquarters means California has the greatest interest in the subject matter of this lawsuit.

<u>**JURISDICTION AND VENUE**</u>

24.  This Court has original jurisdiction over this case under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2). Minimal diversity exists between members of the proposed Classes and Honda. Plaintiffs are citizens of California, Maryland, and

New York. Honda is a citizen of California. In addition, the amount in controversy in this action exceeds $5,000,000, exclusive of interest and costs, and there are more than 100 members in the proposed Classes.

25.  This Court has personal jurisdiction over Honda. Honda's principal place of business is in California, and/or Honda is engaged in systematic and continuous business activity in California, has sufficient minimum contacts in California, or otherwise intentionally avails itself of the California consumer market.

26.  Venue is proper in this District pursuant to 28 U.S.C. § 1391. Honda's principal place of business is in this District, and a substantial portion of the events or omissions giving rise to Plaintiffs' claims occurred in this District, including oversight of the design, manufacturing, distribution, marketing, sale, and service of the Class Vehicles.

## **FACTUAL BACKGROUND**

**A.    The Class Vehicles; Honda's Representations Regarding the Class Vehicles; Class Vehicle Sales; and Acura MDX Drivers' Tendency to Retain the Class Vehicles**

27.  The Acura MDX is a mid-sized luxury crossover SUV that was first introduced to the US market in October 2000. The Honda Odyssey is a minivan that was introduced by Honda in 1994. The Honda Pilot is a mid-size crossover SUV with three-row seating manufactured by Honda since 2002. The Honda Fit is a subcompact hatchback car manufactured and marketed by Honda since 2001 over four generations. The Honda HR-V is a subcompact crossover SUV manufactured and marketed by Honda over three generations.

28.  Throughout the years, and at all relevant times, Honda consistently and widely marketed the Class Vehicles as high-value, value-retaining, stylish, luxurious, and durable vehicles. Honda's marketing of the Class Vehicles has enabled it to charge consumers premium prices for the Class Vehicles. For example, the price range for a 2025 Acura MDX is $50,900 to $74,850.

29.  Honda directly markets the Class Vehicles to consumers via extensive nationwide, multimedia advertising campaigns on television, the Internet, billboards, print publications, mailings, and through other mass media.

30.  For example, in the 2014 Acura MDX brochure, Honda touted the Acura MDX as "a luxury experience for mankind:"

> INTRODUCING THE EXTREMELY NEW 2014 MDX
>
> The SUV that set standards for an entire industry has raised them once again.
>
> Reinvention isn't something we discover. It's something we create. The ability to push ego aside and begin again, through the abandonment of what was familiar and maybe even good enough. That was the inspiration behind our own recreation of the MDX. Its entire soul reimagined. Because if your quest is to build the world's smartest luxury SUV for mankind, you have to hold yourself to the standards of mankind. This is the extremely new 2014 Acura MDX. More than an SUV, it's a luxury experience made for mankind

31.  Likewise, in the 2014 Acura MDX press kit, Honda made the following representations:

- "The 2014 MDX is the third generation of Acura's seven-passenger luxury performance SUV, the first to be developed from the ground up using an all-new, purpose-built platform (body and chassis) fully optimized for the needs of today's luxury SUV buyers."

- "The 2014 MDX design, created in the Acura Design Studio in Torrance, California, was developed under the theme of 'Aero Sculpture.' With its alluring proportions, smooth, arching bodylines and confident stance, the 2014 MDX communicates a look of sophistication and elegance while delivering new levels of aerodynamic efficiency."[5]

---

[5] https://hondanews.com/en-US/releases/release-2a4a937df0b943c284e14f6d469348af-press-kit-

32. Honda made substantially similar representations regarding value, the ability to retain value, style, luxury, and durability in product brochures and other marketing for all Class Vehicles in all model years.

33. For example, Honda marketed the Class Vehicles for their excellent value in relation to their cost, as well as their ability to retain that value. Honda repeatedly touted the Acura MDX as a winner of the U.S. News & World Report Best Cars for the Money Award, including in 2014:

- "Acura's hottest sellers, MDX luxury sport utility vehicle and RDX luxury crossover SUV, have won U.S. News & World Report's 2014 awards with MDX taking the 'Best Luxury 3-Row Midsize SUV For The Money' award and RDX winning the 'Best Luxury Compact SUV For The Money' category.'

- "'The MDX and RDX continue to win accolades for their outstanding combination of exhilarating, performance, great fuel efficiency, and outstanding value on a luxury scale,' said Jeff Conrad, vice president and general manager of Acura Sales. 'With the five-passenger RDX and new seven-passenger MDX, Acura has unquestionably two of the most competitive luxury SUVs in the market.'"[6]

34. Similarly, in a June 2013 press release, Honda stated that the "Honda Odyssey led the minivan segment for maintaining the highest projected residual value after five years of ownership as a percentage of value when new," an attribute Honda emphasized applied for all Class Vehicles:

> "Honda models definitely punch above their weight when it comes to value with class-leading quality, safety ratings, standard features and a company commitment to avoid value-sapping fleet sales" said Mike Accavitti, senior vice president of automobile operations for American Honda."

---

2014-acura-mdx.
[6] https://acuranews.com/en-US/releases/release-352eda959a624dac96bc7a6b06004c1a-acura-mdx-and-rdx-win-u-s-news-world-report-2014-best-cars-for-the-money-awards.

35.  Honda advertised the Class Vehicles' exterior paint as a central and integral attribute of the Class Vehicles, an attribute that was necessary to complement the Class Vehicles' value, ability to retain value, style, luxury, and durability.

36.  For instance, in the 2014 Acura MDX press kit, Honda made the following representations regarding the durability and resilience of the Acura MDX's paint and suggested that the Class Vehicles' paint was essential to "compliment" the Acura MDX's luxury design, including the White Diamond Pearl paint:

- The 2014 MDX is available in seven exterior colors, including three metallic and four pearl colors. All colors are expressive and luxurious in appearance, complimenting the MDX's sophisticated and dynamic body shape. The acid-resistant epoxy clear-coat paint is superior to typical clear-coat paints for increased resistance to urban pollutants:
  - Silver Moon Metallic
  - Crystal Black Pearl
  - Dark Cherry Pearl
  - Forest Mist Metallic
  - Graphite Luster Metallic
  - Fathom Blue Pearl
  - White Diamond Pearl[7]

37.  Honda made substantially similar representations regarding the Class Vehicles' paint in marketing materials for Class Vehicles. For instance, the 2014 Honda Odyssey brochure encouraged consumers to find the "perfect" combination between exterior and interior colors, including White Diamond Pearl. An August 2011 press release for the Honda Pilot marketed a "sleek new look" and included the available paint colors, including Taffeta White and White Diamond Pearl. The 2015 Honda Fit brochure emphasized the model's "complete redesign," encouraged consumers to "choose the right fit," and highlighted the various available paint colors,

---

[7] As one other example, in the 2017 Acura MDX Press Kit, Honda made the following representations regarding the durability of Class Vehicles' paint: "All colors are expressive and luxurious to compliment the redesigned MDX's sophisticated and dynamic body shape. The acid-resistant epoxy clear-coat paint is superior to typical clear-coat paints for increased resistance to urban pollutants."[7]

including White Orchid Pearl. Likewise, the 2016 Honda HR-V brochure stated, before listing available paint colors (including White Orchid Pearl for all trim levels): "[f]unctionality versatility and efficiency are all important in a vehicle- and the HR-V is definitely all those things. But let's not kid ourselves: looks matter too. Fortunately, the HR-V overdelivers in that department. By a mile."

38.   The Class Vehicle models are some of the highest-selling vehicles in the United States market during the relevant timeframe because of Honda's marketing of the Class Vehicles as high-value, value-retaining, stylish, luxurious, and durable vehicles.

39.   For example, on July 11, 2014, Honda issued the following press release, highlighting the 2014 Acura MDX as the highest selling three-row luxury SUV of all time:

- "Record sales in the first six months of 2014 have strengthened the third-generation MDX's position as America's best-selling three-row luxury SUV – not only in 2014, but of all time. Through June, sales of MDX are up 68.4 percent (compared to the same period last year) to 30,664 units, bringing cumulative sales of the MDX over its nearly 15-year history to 692,710 units, making it the most popular three-row luxury SUV of all time*. In fact, the MDX has topped all other three-row luxury SUVs in the annual sales rankings in every year since 2002. Cumulative U.S. sales of MDX are anticipated to surpass 700,000 units before the end of the year."

40.   Honda has sold approximately 550,000 Acura MDXes between 2014 and 2023 to Plaintiffs and other Class members based on Honda's effective branding of the Acura MDX.

41.   The other Class Vehicles have found similar sales success based on Honda's marketing of the Class Vehicles as high-value, value-retaining, stylish, luxurious, and durable vehicles. The Honda Odyssey, for example, has been one of the best-selling minivans during the relevant timeframe, with 1.3 million Odysseys sold by Honda during that time.

42.  As a result of Honda's marketing, Plaintiffs and Class members formed a reasonable belief and expectation that the paint used on the Class Vehicles was of high quality, would endure, and positively impact the long-term value of the Class Vehicles. Furthermore, Plaintiffs and Class members paid a premium to purchase their Hondas in white paint, as vehicles painted white are generally more expensive when compared with vehicles in other colors.

43.  Likewise, based on the marketed durability and longevity of the Class Vehicles, Plaintiffs and Class members formed a reasonable belief and expectation that the Class Vehicles paint would last a time commensurate with the useful life and longevity of their Class Vehicles, that is, a timeframe well-exceeding over ten years. Recent data from S&P Global Mobility, which tracks state vehicle registration data nationwide, indicates that the average American currently keeps their vehicles a record 12.6 years.

44. Class members confirm that the Class Vehicles are durable, and a substantial portion of Class Vehicles remain on the road more than ten years after Honda sold or leased them. For example, Acura MD owners widely note on various online sources that their Acura MDXes have reliably driven well-over ten years and well over 100,000 miles, especially with regular maintenance.[8] Thus, Plaintiffs and Class members reasonably expected that the Class Vehicles' paint would remain intact for that same duration.

45.  Moreover, reasonable consumers like Plaintiffs and the Class members reasonably expected that the Class Vehicles' paint would not fail, peel, delaminate, flake, or bubble under normal conditions during the reasonably expected life of the Class Vehicles and/or cause other problems that would negatively impact the value of the Class Vehicles.

---

[8] *E.g.*, https://www.mdxers.org/threads/looking-for-who-has-the-most-miles-on-their-mdx.85426/; https://www.mdxers.org/threads/how-many-miles-on-your-2nd-gen-mdx.40925/page-13?post_id=1581164&nested_view=1&sortby=oldest#post-1581164; https://www.reddit.com/r/Acura/comments/15fylsa/how_many_miles_has_your_acura_mdx_which_year/.

46.  Plaintiffs and Class members were exposed to and relied on Honda's pervasive, long-term, national, multimedia marketing campaign touting the supposed value, style, luxury, and durability of the Class Vehicles, including the quality and durability of the exterior paint (and the exterior paints ability to complement the aesthetics and style of the Class Vehicles).  Plaintiffs and Class members justifiably made their decisions to purchase and/or lease their Class Vehicles based on Honda's misleading marketing.

47.  However, as discussed below, rather than produce Class Vehicles with durable, high-quality paint complementing the Acura MDX's "sophisticated and dynamic body shape" and lasting the Class Vehicles' expected useful life, Honda knowingly manufactured and sold the Class Vehicles with a Paint Defect that causes paint failure, peeling, delaminating, bubbling and flaking during the expected life of the Class Vehicles, greatly reducing their value and consumer desirability, and also resulting in costly repairs.

48.  Plaintiffs and other consumers did not and could not know of latent dangers arising from Honda's design specifications or manufacturing processes, including the risk that the Products were at unreasonable risk of catching fire. Moreover, Plaintiffs could not reasonably discover the risk of fire or burning through inspection of the Products or other reasonable means.

**B.    Honda's Paint Process and the Paint Defect**

49.  The Class Vehicles all suffer from a Paint Defect which causes the white paint applied to the Class Vehicles to prematurely fail, bubble, peel, delaminate, and flake during the reasonably expected life of the Class Vehicle.

50.  The Paint Defect in the Class Vehicles is a systemic defect in the Class Vehicles' white paint; the white paint as applied to the Class Vehicles' exterior materials; and/or the manufacturing processes Honda used to apply the Class Vehicles' white paint.

51.  The Paint Defect is not associated with geography or other environmental

factors because the Paint Defect is found in Class Vehicles in every state, regardless of climate or other geographical factors (such as proximity to cities and pollution exposure). Moreover, the Paint Defect only impacts Class Vehicles (all painted white), as opposed to Honda vehicles painted in other colors.

52. During the relevant timeframe, the Class Vehicles were primarily manufactured in Honda's Lincoln, Alabama (2013-2017) automobile factory using a robotic paint system.

53. The Honda painting process involves several critical steps:

- Each body is cleaned and degreased, and then undercoated by immersion in a zinc-phosphate bath.

- The body is then dipped in a soluble, electro-deposited primer (called an e-coat).

- To prevent dust and moisture from accumulating in critical areas, special sealants are sprayed into crevices and seams in the body.

- Areas of the body that are susceptible to stone and gravel damage are coated with a special anti-chipping primer.

- An intermediate primer coat is applied, followed by either a polyester-resin or acrylic-resin topcoat and, if a metallic or pearlescent paint color is involved, a mid-coat.

- Metallic and pearlescent paints—like those involved in this case—receive an additional clear coat.

54. The Paint Defect here stems from: (1) the white paint applied to Class Vehicles itself; (2) issues involved in applying "three-stage" or "tri-coat" paint on a vast majority of the Class Vehicles, including the Diamond White Pearl, White Orchid Pearl, Bellanova White paint colors (and now widely failing, bubbling, peeling, delaminating, and flaking); and/or (3) issues with the Class Vehicles' primer, e-coat, and clear coat paint layers.

55. In most cars, there are only two primary paint layers, starting with the colored "base coat" at the bottom, and then topped with a "clear coat." With a three-stage paint, however, there is an additional "mid coat" pearl or metallic paint layer

between the base coat and the clear coat.

56.   Three-stage paints add a sparkling finish to a car's overall paintwork, giving the surface a sense of depth or richness that two layers alone would not be able to accomplish. Due to aesthetic benefits, three-stage painted cars are more appealing and costly to consumers, including the Class Vehicles purchased by Plaintiffs and Class Members.

57.   However, three-stage paints like the paint colors underlying the Paint Defect are far more likely to peel or delaminate, as well understood by car manufacturers (including Honda) and as seen in the Class Vehicles. Key factors contributing to the early peeling of three-stage paints include:

- Inconsistent Application: The process requires meticulous precision. Any variation in the application of the clear coat or insufficient curing can lead to adhesion problems, resulting in premature peeling; and

- Complexity and Cost: The additional layers in three-stage paints increase both cost and application difficulty. Minor defects during production were more likely to result in long-term durability issues.

58.   The three-stage pearl paints used on Class Vehicles were prone to peeling, delaminating and other issues due to a latent defect in the "three-stage" white paint itself, or in the manufacturing process (such as an inconsistent application of the paint) Honda used to apply the white paint during the relevant timeframe.

59.   In addition, primer is an essential element in the quality of the adhesion between the e-coat and the basecoat. Primers must be tested for their ability to withstand "chemical reactivity" to UV light and extreme weather conditions because disintegration of any agents within the primer will likely cause "a drastic loss of adhesion and delamination of the topcoat [clearcoat]."[9] The durability of the paint, and the prevention of corrosion, is dependent upon the adhesion of the layers of the paint

---

[9] Nelson K. Akafuah, et al., *Evolution of the Automotive Body Coating Process—A Review, MDPI* (June 13, 2016), p. 20, http://www.mdpi.com/2079-6412/6/2/24.

system, including the e-coat, primer, and clear coat layers.

60.   Intercoat adhesion of all paint layers—including the Class Vehicles' e-coat, primer, and clear coat layers–is a critical determinant of the quality of a paint system on any item (including the ability to withstand UV light), not just automobiles. Achieving excellent performance and application properties of any paint requires a holistic approach to ensure compatibility, not only within a paint formulation across all ingredients, but also between the paint formulation and the paint system used for the application of the paint, so that all paint layers can properly work together and bring out those properties.  An inadequate layer or poor adhesion between layers (i.e., poor intercoat adhesion) is the weakest link of a paint system, and greatly increases the probability of paint system failure, such as the peeling, delaminating, and other paint issues at issue in this case.

61.   Given the purpose of automotive coatings and the value added by a quality paint job, automobile companies spend millions of dollars conducting a myriad of long-term and short-term tests to ensure automotive paints provide excellent aesthetics and performance properties.

62.  Degradation of the e-coat and primer coatings in an automotive paint system—as was highly likely in the case (in addition to issues related to the white paint's three-stage painting process)—can be caused by the defective nature of the materials and paint layers used or the improper manner in which they are applied during the painting process, resulting in accelerated degradation at the interface between the clear, mid-coat, and/or basecoat.  This degradation causes a loss of adhesion and will manifest as peeling or delaminating, and eventually rusting and damage to the vehicles' exterior.  This is what happened and is happening to the Class Vehicles.

63.  Reasonable consumers contemplating the purchase or lease of a Class Vehicle developed a reasonable and material expectation regarding the quality and longevity of the paint used on Class Vehicles based on Honda's nationwide public advertisements, statements, and representations regarding the high-value and durability

of its vehicles and paints, including Honda's representations regarding the "epoxy clear-coat paint" discussed above.

64. Contrary to these reasonable and material expectations, and Honda's advertisements, statements, and representations, however, the paint systems on the Class Vehicles have failed due to the Paint Defect–a clear loss of adhesion between the Vehicles' clear coat, mid-coat, and base coat.

**C.    The Paint Defect Is Widespread in the Class Vehicles, and in 2019, Honda Acknowledged the Defect by Implementing (Inadequate) Extended Warranty Programs**

65.  As demonstrated by a multitude of complaints and reports made by owners and lessees of Class Vehicles, the Paint Defect is a ubiquitous issue for Class Vehicles and manifestation of the Paint Defect is almost a certainty at this point.

66.  Class member reports relating to the Paint Defect bear striking similarities to one another and (as further detailed below) the Plaintiffs' experiences with the Paint Defect and Honda's response to the Paint Defect, including:

- Reports of premature paint failure, such as peeling, delaminating, bubbling, and flaking during the reasonably expected life of Class Vehicles;

- Reports of Honda, auto paint technicians, and auto body repair shops being well-aware of the Class Vehicles' Paint Defect;

- Reports of the inadequacy and arbitrary administration of Honda's warranties and extended warranties directed toward the Paint Defect;

- Reports of Honda or its agents' improper refusal to repair the Paint Defect; and

- Reports of high estimates and high costs to repair the Paint Defect, inadequate repairs, and risk of further paint failure (stemming, for instance, from the repainting of only one panel as opposed to the whole car).

67.  On MDXERS.org, a popular forum for Acura MDX owners, Class members

on a forum thread titled "2016 MDX Roof Paint Peeling VIN Specific" describe their experience with the Paint Defect and with Honda as follows:[10]

- Acu2016 on Feb. 15, 2024
    - Our 2016 MDX with white diamond pearl paint just started peeling on the roof and it's getting worse. Thanks to this forum, I found out that Acura has 8 year Warranty Extension TSB 19-029 on 2014-2016 MDX with white diamond pearl paint.

      So I called Acura. After the rep did the search on their system, I was told that our VIN number is not in the list that qualify for this warranty extension. Even though the our MDX has exact problem described on TSB and it's within 8 year time and the model.

      I requested to talk to the case manager and now I'm waiting to hear from them. I told them I want to send the photos and spoke with 7 different shops. All the shops said the same. It's the manufacturer paint failure.

- J-Rods on Feb. 19, 2024
    - I have the same exact peeling paint in the exact same spot. Spoke with the Honda America rep and was told the same. My vin is not in range. I asked if they changed the paint & if so, it didn't work. Asked to speak with someone else above the rep in management and was denied. I was asked to complete their survey and I was honest. I gave the lowest rating possible & need to figure out the next step Will be reaching out to an attorney for advice.

- Serius on Feb. 28, 2024
    - I also have the same peeling at the same spot on my white diamond pearl 2016 MDX. Honda America also denied my claim for the same reason: VIN not in range. I bought my car on August 2015, and the issue occurred on Sept 2023. I filed the claim on through Acura dealer a week after the peel occurs, and Honda America said the extended warranty started from the date the car rolls out from the factory (May 2015), not the date I bought the car.
    Please let me know if there is a class action lawsuit and I will be happy to join

---

[10] https://www.mdxers.org/threads/2016-mdx-roof-paint-peeling-vin-specific.182510/

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

- ppruiett27 on Mar. 2024
  - Yes, I just noticed this weekend. We called Acura and they also said since its been past 8 years more like 9 1/2 they are denying. It is obviously a paint problem as it delaminated all the way to the metal. No help from the dealer or Acura Warranty. If you get anywhere please let us know. I am very disappointed.

- Miles2016 on Mar. 12, 2024
  - New to this Forum~ Isn't there stregth in our numbers ? I had my transmission changed out due to faulty shifting, the dealer discovered it when I was doing my 100K tuneup~ the dealer took care of it in(2023) wih no charge to me, why not fixing this paint issue ?

- Joie on Mar. 22, 2024
  - Same issue here. Didn't really notice the issue during the COVID years and now a massive spot around the front roof. Honda USA said they won't cover it because the 8 years has passed. Bunch of clowns.

- Bill G on Apr. 5, 2024
  - Same here! Got denied even though it is a well known problem. Unfortunately our 2015 was manufactured in 2014 and is over the 8 year mark. I'd certainly sign on to a class action!! Paying all that money to have paint peel off prematurely is ridiculous…

- Beckyrob84 on Apr. 15, 2024
  - I have a 16 with the correct paint code. And this Saturday i walked outside and saw a huge chip of paint missing from the roof. Called Acura and it was out due to the time of when the vehicle was purchased. This is absolutely insane! Something needs to change

- Erkuan on Apr. 15, 2024
  - Same here. I got 2016 MDX in 2015 and just exceeded the warranty for couple of month. The Honda rejected to pay for the repair and the local dealer did nothing to help me.

- Whtdiamondpearlpurgatory on May 13, 2024
  - Anyone having any luck here? I have a 2016 MDX with this issue. The rooftop paint actually started peeling in 2019 and at the time

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

we took it to our Acura dealer and had it repainted under warranty (though of course they contracted out the paint work to a body shop). Just this week it started peeling AGAIN, just behind the sunroof. So far I am getting stonewalled at all levels, corporate reps are telling me it's hopeless. What a terrible experience, especially for a "luxury" brand. We did the right thing and the issue SHOULD HAVE been addressed in 2019, and now I'm told there is no recourse since the 8-year extended warranty is up. I feel like there should be an exception given that we took it to them for repair and the underlying issue was not addressed. But I'm running out of ideas.

- minh.b.nguyen on May 28, 2024
  - same problem here...was told by Acura America and dealer tough luck...so much for "luxury vehicle".

- Randramey on June 19, 2024
  - I agree. I called the Acura dealer in San Jose and they told me the same thing. I told them that the problem just started a month and a half ago, so when they told me that it was out of the extended warranty, I was angry.
    With all of the claims that are identical, there needs to be something done. Like a Class Action lawsuit. American Honda is showing how their "plausible deniability" is a true reflection that they really don't care about their customers. The dealer even stated that they could not give me a discount of the body work. I have been buying Acura's for the past 15 years; however, I am done.

68.  This is a sample of the complaints on MDXer.org, which is just one of a slew of forum threads on the Paint Defect manifestation in the Acura MDX, each of which contains sometimes dozens of replies describing experiences with the Paint Defect and Honda's refusal to address the issue.[11] One other thread titled <u>Brand new</u>

---

[11] *E.g.*, (1) White Pearl Paint Peeling from 2012 Acura MDX, https://www.mdxers.org/threads/white-pearl-paint-peeling-from-2012-acura-mdx.173528/?post_id=1613669&nested_view=1&sortby=oldest#post-1613669; (2) 2016 Roof Paint Peel Not Covered Under Extended Warranty/Recall, https://www.mdxers.org/threads/2016-roof-paint-peel-not-covered-under-extended-warranty-recall.180931/?post_id=1612987&nested_view=1&sortby=oldest#post-1612987; (3) Pearl White Paint Recall Story, https://www.mdxers.org/threads/pearl-white-paint-recall-story.178147/?post_id=1612981&nested_view=1&sortby=oldest#post-1612981; (4) 2016 Roof

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

1    <u>2014 MDX Paint peeling</u>, posted by "nelci" on October 9, 2013 (prior to Plaintiffs'

2    purchases), states the following:

3            Hi,

4            Bought a brand new 2014 SH-AWD MDX Tech Pearl white
5            on 09/21/2013. Paid total $53000 for it.

6            After a week while washing the car, I saw a black patch and
             realized the paint is peeling off on the front A pillar passenger
7            side.

8            Contacted the dealer and Acura claims.

9            They are offering to paint the car. Re-painting a brand new
10           car very disappointing.

11           They claim car does not depreciate in value because of this,
             but does not want to give it in writing.

12
             Also, they do not want to warranty the life time of the new
13           paint will be as good as OEM paint.

14           Really appreciate any suggestions on how to deal with the
15           problem.

16

17   _____

18   Paint Peel Not Covered Under Extended Warranty/Recall, https://www.mdxers.org/threads/2016-roof-paint-peel-not-covered-under-extended-warranty-recall.180931/?post_id=1610874&nested_view=1&sortby=oldest#post-1610874; (5) Paint peeling problem for 2014 MDX White Diamond Pearl, https://www.mdxers.org/threads/paint-peeling-problem-for-2014-mdx-white-diamond-pearl.180088/?post_id=1610456&nested_view=1&sortby=oldest#post-1610456; (6) How much to paint the roof - is it worth it before trading? Paint peeling issue., https://www.mdxers.org/threads/how-much-to-paint-the-roof-is-it-worth-it-before-trading-paint-peeling-issue.183186/?post_id=1608426&nested_view=1&sortby=oldest#post-1608426; (7) 2014 MDX White Pearl Peeling Paint - Need TSB info, https://www.mdxers.org/threads/2014-mdx-white-pearl-peeling-paint-need-tsb-info.178594/?post_id=1608174&nested_view=1&sortby=oldest#post-1608174; (8) PSA: 2014-2016 White Diamond Pearl Sucks, https://www.mdxers.org/threads/psa-2014-2016-white-diamond-pearl-sucks.170150/page-2?post_id=1596678&nested_view=1&sortby=oldest#post-1596678; (9) White paint, https://www.mdxers.org/threads/white-paint.181496/?post_id=1594658&nested_view=1&sortby=oldest#post-1594658; (10) White Diamond Pearl peeling??, https://www.mdxers.org/threads/white-diamond-pearl-peeling.174242/?post_id=1526860&nested_view=1&sortby=oldest#post-1526860；(11) Painted the roof black!, https://www.mdxers.org/threads/painted-the-roof-black.172434/; Peeling paint on 2017 MDX, https://www.mdxers.org/threads/peeling-paint-on-2017-mdx.183087/.

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

69. Reports of the Paint Defect in the Acura MDX are not only limited to MDXER.org but, instead are confirmed elsewhere on the internet, including on the National Highway Traffic Safety Administration website,[12] CarComplaints.com,[13] AcuraZine.com (another popular Acura forum);[14] and Reddit.com,[15] among other sources.

70. Owners and lessees of Class Vehicle in other makes and models have made substantially similar widespread complaints of the Paint. Honda Odyssey owners and lessees, for instance, have reported the following on Odyclub.com, a popular Honda Odyssey forum:[16]

- VanMorrison on June 14, 2024
    - Yep, same here. Their unwillingness to stand by their paint has ensured that I'll never again purchase another Honda product. I've owned many cars and NEVER had paint issues like this. I had a Benz for 15+ years that never had similar issues and we've had a Tesla now for 7 years, and for all the people yapping about poor Tesla paint quality, the Tesla has more miles than the Odyssey and the paint is immaculate. Meanwhile, this supposedly top of the line Odyssey is shedding it's skin like a ghoul in Fallout....
      Honda can seriously go paint themselves.

- Kristylea on April 6, 2024
    - My 2014 Pearl White Odyssey is peeling everywhere! The side doors, the hood and the top of the roof! I've never seen this before on Hondas that are way older than 10 years! I jumped on here to see if this was just my van or a pearl white issue…..so mad this is happening since these vans last forever minus the paint! I'm hoping Honda does something but it sounds like they aren't. Class action lawsuit should happen if they won't fix the problem since pearl white was the best color IMO. Everyday more paint chips away in

---

[12] *E.g.*, https://www.nhtsa.gov/?nhtsaId=11583646.
[13] *E.g.*, https://www.carcomplaints.com/Acura/MDX/2014/body_paint/paint_issues.shtml; l
[14] https://acurazine.com/forums/3g-mdx-2014-2020-414/mdx-paint-peeling-off-980490/
[15] https://www.reddit.com/r/Acura/comments/1aslcss/acura_mdx_peeling_paint_anyone_else_have_this/; https://www.reddit.com/r/Acura/comments/11pvjfx/2014_mdx_white_pearl_paint_issue/
[16] *E.g.*, https://www.odyclub.com/threads/paint-peeling-on-my-2014-odyssey.362519/?sortby=newest#replies

chunks!

- Ba Yani on Mar. 14, 2024
  - o I have the same situation, my 2014 Odyssey white paint suddenly is peeling off.





- CSHIRLEY on February 1, 2021
  - o I have spoken with Honda Motor Corp and they refuse to do anything about the obvious paint defect for White Pearl. Has anyone considered joing [sic] to file a class action lawsuit to receive compensation? A local body shop quoted $1,000.00 to make the repairs to my car. The paint is coming off in chunks on the driver's side passenger door.

71. Honda Pilot owners have also made widespread reports of the Paint Defect

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

on Piloteers.org, a popular Honda Pilot forum:[17]

- **Taliak on November 28, 2022**
  - I am so angry at Honda. My pilot 2012 Honda is peeling by chunks. I heard of a class action lawsuit that was settled in Quebec. Wondering if we know of any in regards to our pilots? Or if anyone is willing to start one here in Canada?

- **Frustrated on July 23, 2024**
  - I have a 2015 White Pilot, which I bought used in Dec 2017. My paint started coming off Oct/Nov of 2022. I went to Honda, who referred me to a collision center who TOLD ME that it was a known defect that the white pearl Hondas and Toyotas from this specific year - Honda would not cover it. The roof from my windshield to my sunroof is gone and now my hood is starting to peel. By the time it started peeling, my warranty had expired 4 months prior; A warranty I have no knowledge of. It's so frustrating.

- **Blaker on July 20, 2024**
  - I bought a used 2015 pilot, pearl white with 61k miles. It must have had some paint work and in a month the whole hood was pealing. tried to get support from honda. No such luck post 7 year extended warranty. $3k in painting later I am looking for some partial support.

- **Hermiehug on May 6, 2024**
  - 2013 model (White Diamond) and now seeing 2nd occurrence of paint peeling. Went back to look at service history, and see that I happened to report the first occurrence in May 2020 - exactly 3 months before the 7-yr extended warranty expired!! Talk about a stroke of luck! (At the time, the roof was repainted by Honda with no cost to me.)

    Based on all the previous posts, I guess I'm on my own with this 2nd occurrence? Or did someone have success with getting it addressed by Honda?

    Disclosure: I have not yet discussed the issue with Honda dealership. I thought I should come to Piloteers as first step, so that I can be well informed when I speak to Honda.

---

[17] https://www.piloteers.org/threads/pilot-paint-peeling-class-action.178384/?sortby=newest#replies

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

- **Jolenecmccall on March 3, 2024**
- Same problem where do I go to file the suit! I purchased this 2014 Honda
  Pilot Touring $50,000 car new from the dealer. Took it there this weekend
  to show them the damage that appeared in January 2024. They said it is
  past their extended 7 year warranty. Shocked I haven't received anything
  about my car ever from them! It is clearly a supplier and their choice a
  manufacture problem. This car is immaculate and has been garage kept
  and hand washed always. The dealer sent me to their paint and body shop
  (waste of my day) and the repair to paint not just the roof but hood was
  beginning to show signs too was over $4,000 I will not pay this they need
  to. It is not fair to me to have this expense for just a 9 year old vehicle. It
  began peeling off like sign vinyl, pathetic. This is an expensive vehicle
  and amazed at Honda's lack of interest in wanting to keep their customers.
  Help where can I go file this class action law suit and is there one already
  started?



72.  Owners and lessees of Honda Fits and Honda HR-Vs also note the
widespread existence of the Paint Defect on their vehicles on Reddit.com, among other
online sources:[18]

- **Kittymatcha in or about October 2023**
  - 2019 Honda fit paint peeling
    Of course my car is not included in the paint repair warranty for
    other Honda fits of prior years. Anyone else having the same issue
    with their Honda fit? I bought mine in October 2019.

---

[18] https://www.reddit.com/r/hondafit/comments/15gl28z/2019_honda_fit_paint_peeling/;
https://www.reddit.com/r/HRV/comments/182753x/honda_refusing_to_cover_2016_paint_peeling/.

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL



- **Jimmycheapseaweek on May 6, 2024**
  - My 2019 Fit did the exact same thing…and it's white as well. Honda won't fix this even though it's so obvious their white paint is [expletive]. The only way they might consider paying for the repair is if you are someone who always takes your Honda to the dealer for all your regular service or if you know someone at Honda corporate to pull some strings for you.

- **Urbanglowcam in or about October 2023**
  - Honda refusing to cover 2016 paint peeling
  - The paint on my 2016 orchid pearl is clearly flaking off. Honda isn't honoring the extended warranty since I am a little outside of the 7 year extension. Anyone experience something similar or have advice?



CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

- **Vt8919 in or about October 2023**

  o My 2016 had its roof repainted a year ago under warranty. The funny thing is that Honda paid a Chrysler dealership to do it since it was the closest paint shop in my area that met their standards.

  There's also flaking in the gap where the front fenders and the hood meet, and on the rear spoiler in the gap between it and the roof. But those areas have been manageable and haven't gotten worse in years.

  White water based paint has a hard time bonding to the primer so it's a problem amongst multiple brands. Honda, Toyota, Hyundai, Kia, Ford and GM seem to have the worst issues.

73. In 2019, Honda could no longer feign ignorance and acknowledged the widespread Paint Defect, issuing various TSBs[19] for some of the impacted make/models/model years/and paint colors, providing an (inadequate) extended warranty to repair or compensate owners and lessees of Class Vehicles experiencing the Paint Defect.

74. For instance, TSB 19-029, "Warranty Extension: White Diamond Pearl Paint," issued by Honda on June 1, 2019, states in part:

> This warranty extension only applies to 2014-16 MDX vehicles that are painted NH-603 White Diamond Pearl.
> The exterior paint on the roof and/or tailgate may peel off. American Honda is extending the warranty on the paint of the affected vehicles to 8 years from the original date of purchase with no mileage limit.
>
> ***
>
> This warranty extension only applies to the panels listed in the WARRANTY CLAIM INFORMATION section if they exhibit a paint peeling problem. All paint repairs MUST have DPSM approval before starting work.
>
> ***

---

[19] A Technical Service Bulletin (TSB) is a document that provides instructions for repairing a vehicle when a manufacturer identifies a recurring problem. TSBs are created when a manufacturer receives information from dealers and customers about common issues, and then addresses them once a fix is approved

**CORRECTIVE ACTION**

**Inspect the vehicle and, if necessary, have a ProFirst Certified Body Shop repaint the entire affected panel(s) with a tri-coat color, mid (mica) , and clear coat paint after obtaining DPSM approval.[20]**

\*\*\*

3. Inspect the roof and tailgate areas for damage

If the paint on the vehicle appears similar to the images below, go to REPAIR PROCEDURE.[21]



75.  TSB 19-055, "Warranty Extension: Taffeta White Paint," issued by Honda on August 29, 2019, applied to 2013 Honda Odysseys and 2014-2015 Honda Pilots, provided an extended warranty for seven years from the original date of purchase with no mileage limit, and stated regarding the covered Honda Odysseys and Pilots that "[t]he exterior paint on the roof and/or tailgate may peel off."[22]

76.  TSB 19-064, "Warranty Extension: NH-788 White Orchid Pearl or Bellanova White Paint" issued by Honda on August 29, 2019, applied to 2015-2017 Honda Fits and 2016-2018 Honda HR-Vs, provided an extended warranty for seven years from the original date of purchase with no mileage limit, and stated that "[t]he

---

[20] https://static.nhtsa.gov/odi/tsbs/2019/MC-10161250-0001.pdf (emphasis in original)

[21] On or about August 29, 2019, Honda superseded TSB 19-029 to cover only outsourced work to third-parties, stating: "As of August 29, 2019, only sublet claims will be accepted. Prior flat rate-based warranty claims will no longer be accepted. https://static.nhtsa.gov/odi/tsbs/2019/MC-10164472-0001.pdf (emphasis in original).

[22] https://static.nhtsa.gov/odi/tsbs/2019/MC-10164449-0001.pdf.

exterior paint on the vehicle may peel off."

77.  As addressed below in Section H, the extended warranties provided by Honda through its TSBs, as well as Honda's standard and extended warranties were unconscionable and fraudulent.

**D.    Honda Knew of the Paint Defect before It Sold Class Vehicles to Plaintiffs**

78.  Honda knew about the Paint Defect before it sold or leased Class Vehicles with the Paint Defect to Plaintiffs (Plaintiff Toussaint in late 2013; Plaintiff Hernandez in late 2017 (lease) and late 2020 (purchased); and Plaintiff Clemmens in 2019) and Class Members, based on: (i) internal paint testing; (ii) prior TSBs from Honda involving substantially similar paint issues; (iii) consumer reports of the Paint Defect; and (iv) a prior settled Canadian class action lawsuit directly addressing the a substantially similar paint issue as the Paint Defect at issue in this case. Despite its knowledge (as detailed below), Honda did not disclose and actively concealed the Paint Defect to Plaintiffs and the Class.

i.    *Internal Testing*

79.  Prior to a new paint and/or paint system being used on a vehicle (such as the epoxy clear coat system used by Honda, for instance), automakers such as Honda are known to employ multiple standards and test protocols to ensure long life and film integrity of the paint system as well as the underlying substrate. In addition to extensive exterior and accelerated weathering evaluation of clearcoats, there is additional aggressive testing prior to the qualification of an automotive coating system to ensure the paint system will provide long lasting protection when exposed to environmental elements. These tests often run over the course of two-to-five years before a vehicle using the paint system is brought to market.

80. Most of these test procedures are developed and standardized by the American Society for Testing and Materials ("ASTM") and the Society of Automotive Engineers ("SAE"), and typically include:

a. accelerated weathering tests to assess paint color, gloss retention, and appearance in general, such as Xenon Arc (subjecting test panels to intense radiation), QUV (subjecting test panels to high ultra-violet light and condensing humidity cycles), EMMAQUA (placing test panels on racks that rotate with the sun to provide maximum UV light exposure), and humidity tests (subjecting test panels to 100% relative humidity at 100°F for several weeks);

b. long-term outdoor weathering tests, where test panels are placed on so called "test fences" at 45-degrees facing south (according to ASTM1 standards) in various environments, such as Florida (high UV light, humidity, and salt spray), Arizona (intense UV light and temperature), and industrial sites (high pollutants such as acid rain and various chemicals);

c. corrosion resistance tests, including salt spray (subjecting test panels to 5 wt. salt spray at 95°F for several weeks), cyclic corrosion (subjecting test panels to various cycles of salt spray, humidity, wet/dry, temperature), condensing humidity (subjecting test panels to temperature cycling in highly saturated air, CASS (subjecting test panels to salt spray with added acetic acid for accelerated testing), and Kesternich (subjecting test panels to acid rain simulation);

d. physical and mechanical tests, including flexibility, impact resistance abrasion resistance, scratch and mar resistance, coating thickness, adhesion, and hot and cold cycling; and chemical properties testing, including resistance to solvents, chemicals and various fluids the vehicle will likely encounter in the open environment.

81.  Furthermore, Honda is member of the Automotive Industry Action Group ("AIAG"), which has a common Production Part Approval Process ("PPAP"). According to prevailing automotive industry standards during the relevant period (late 2012 to the present), it was and is standard practice to undertake a PPAP when making changes to an existing automotive design, including a change in paint and the process of applying the paint to a vehicle.

82.  The Automotive Industry Action Group, of which Honda is a member, has developed a common PPAP standard for suppliers of automotive paint. The PPAP is a standardized, required process in the automotive industry that helps manufacturers and

suppliers communicate and approve production designs and processes before, during, and after manufacture.

83.    The PPAP is designed to demonstrate that a supplier has developed its design and production process to meet the client's requirements, minimizing the risk of failure by effective use of advanced planning.    Requests for approval must be supported in official PPAP format and with documented results when needed.

84.    The purpose of any PPAP is to: (a) ensure that a supplier can meet the manufacturability and quality requirements of the parts supplied to the customer; (b) provide evidence that the customer engineering design record and specifications are clearly understood and fulfilled by the supplier; and (c) demonstrate that the established manufacturing process has the potential  to  produce the part  that  consistently meets all  requirements  during the actual production run at the quoted production.

85.    Typically, there are numerous PPAP requirements, including for material performance, which includes paint performance. On information and belief, Honda would have required its suppliers to test the paint, and its application, to see how it performed in simulated real-world conditions to determine the quality and durability of the paint, whether the paint adhered to the surface of the vehicle, whether it corroded or delaminated, how it performed when subjected to heat, cold, light, moisture, and rain, whether the color or gloss faded, changed, or was retained, among other performance metrics.

86.    Thus, either as part of the PPAP or independent of it, Honda performed several of the above-described ASTM and SAE test procedures. In fact, Honda has developed what is referred to as "Honda SAE Standards & Testing" that are used in connection with the testing of its vehicles, including D2023-07 Rev.4 "Heat-Resistant Coating," HES D6501-06 "General Test Methods for Coatings," HES D2021-04 "Corrosion Proof Coating (on metals)," and 5100Z-S04-0000 "Painting Quality of Automobile Suspension Arc Welded Parts," as well as various other tests relating to the performance of the paint used on its vehicles, including the Class Vehicles, in

simulated real-world conditions.

87.  The development of the paint and the paint manufacturing process in this case, including the testing performed in connection therewith, would have revealed the Paint Defect.  However, the details regarding the testing performed by Honda and the results of that testing are in the exclusive custody and control of Honda.

88.  Moreover, prior to Class Vehicle distribution, Honda would have conducted factory audits and quality control checks that would have identified irregularities in paint thickness, adherence, which would have made Honda aware of a substantially heightened risk of future peeling.

ii.    *TSBs 19-029,19-055, and 19-064 and Substantially Similar Prior TSBs*

89.  Honda's pre-sale knowledge of the Paint Defect is evidenced by TSBs 19-029, 19-055, and 19-064 addressing the Paint Defect impacting the Class Vehicle. The detailed repair procedure contained in those TSB—which involves removing the paint and the e-coat if damaged and reapplying the paint—indicates Honda's familiarity with the Paint Defect, its cause, and solution.

90.  Honda's familiarity with the Paint Defect and the proper repair procedure stems from its extensive pre-sale experience with substantially similar paint defects and resulting TSBs in other Honda-manufactured vehicles.

91.  Most notably, in May 2008, prior to the start of the sale of the Class Vehicles in this case, Honda issued TSB 08-031, "Warranty Extension: Paint Peeling on Dark Blue 2003-3005 Odysseys," where Honda described a substantially similar paint peeling issue and stated: "[o]n potentially affected vehicles, the exterior paint may peel off the horizontal (flat) surfaces and in recessed areas around the glass or the sliding doors[,]" including—much like this case—the "[roof] including under the top edge of the tailgate, under the top edge of the sliding glass doors, and the top of the panel of the sliding doors.

92.  In TSB 08-031, Honda provided the following pictures of the relevant damage and described a similar repair procedure as set forth in TSB 19-029 (removal of the paint and/or e-coat and repainting):




93.  The Honda Odyssey model years covered by TBS 08-031, like most of the Class Vehicles involved in this case, were painted in Honda's Alabama automobile factory, using a substantially similar defective type of paint and/or substantially similar defective manufacturing process and suffered a substantially similar paint defect as the Class Vehicles here. As a result, Honda fully understood the nature and causes of the Paint Defect from its experiences relating to TSB 08-031 prior to selling the Class Vehicles involved in this case. Honda attempted to ameliorate the paint peeling issue necessitating TSB 08-031 but understood, prior to vehicle sales to Plaintiffs and the

Class, that it did not fully remedy the issue in the Class Vehicles.

94.  Likewise, between August 2012 and September 2014, the beginning of the relevant timeframe and a time well-before Plaintiffs' Class Vehicle leases and purchases (late 2013, late 2017, 2019, and 2020), Honda issued TSBs 12-049, 13-060, and 14-034 addressing "Honda Civic Hood Paint Cracking" and "Civic Roof and Trunk Paint Chalking and Clouding" in 2006-2013 Honda Civics.

95.  TSBs 12-049, 13-060, and 14-034 involved the following pearl and metallic paint colors, which—upon information and belief—were applied by Honda during manufacturing using a three-stage paint process:

- B-92P – Nighthawk Black Pearl
- B-529P – Fiji Blue Pearl
- B-536P – Royal Blue Pearl
- B-537M – Atomic Blue Metallic
- • B-561P – Dyno Blue Pearl
- • NH-701M – Galaxy Gray Metallic
- • NH-731P – Crystal Black Pearl
- • NH-737M – Polished Metal Metallic
- • YR-578M – Urban Titanium Metallic
- • B-586P – Dyno Blue Pearl II (2012 model only)

96.  Based on its experiences with issues with three-stage paints and paint layer adhesion issues in 2006-2013 Honda Civics, Honda would have been well-aware of the paint defects and/or defective paint processes that lead to poor paint adhesion much like the Paint Defect plaguing the Class Vehicles in this case, particularly considering the paint peeling and delaminating issues cited by Honda impacting 2003-2005 Honda Odysseys as described in TSB 08-031. Nevertheless, Honda used similarly defective paints and similar processes to manufacture the Class Vehicles, resulting in the Paint Defect at issue here.

iii.    *Customer Complaints Directly to Honda and Online Sources Honda Monitored*

97.  Honda also knew or should have known about the Paint Defect because numerous consumer complaints regarding Paint Defect were made directly to Honda or on online sources monitored by Honda.  The large number of complaints, and the consistency of their descriptions of the Paint Defect alerted, or should have alerted, Honda that the Paint Defect existed and exclusively affected the Class Vehicles.

98.  The full universe of complaints made directly to Honda about the Paint Defect is information presently in the exclusive custody and control of Honda and is not yet available to Plaintiffs prior to discovery.  However, as set forth above, many Class Vehicles owners complained directly to Honda and Honda authorized dealerships about the Paint Defect.

99.  Many of these complaints occurred at the beginning of the relevant timeframe and a time well-before Plaintiffs' Class Vehicle leases and purchases (late 2013, late 2017, 2019, and 2020). For example, in the "nelci" post described above, the owner states that he informed Honda of the Paint Defect in the 2014 Acura MDX in Diamond Pearl owner and sought a repair for the defect at least as early as October 2013.

100. The "nelci" post is not an isolated report of the Paint Defect in the early relevant timeframe. For instance on CarComplaints.com, users widely describe informing Honda of the Paint Defect in Class Vehicles, as well as substantially similar paint problems in related Honda models, between 2010 to 2013.

- **Warren L; September 25, 2010;2009 Honda Odyssey EX-L 3.5**
- Well we just purchased the Van in July. I notice some small light cracks on bumper. I never really paid attention to it. Now few months later after a few car washes the clear coat is peeling off all over even above the headlights. Clearly a defect in the paint and clear coat. Dealer said they need to take pictures and send it in to Honda to get this fixed. Still no luck. Dealer ask if I hit something or got in a wreck? What a

dumb question when the clearcoat is peeling above lights and on sides of front grill. If I was in a wreck the lights would be gone. Anyway most of the clearcoat is peeled off and winter is now taking its toll on the front end. Will let you know the results. So much for a High Priced Van. :([23]

- **Kelly S., October 6, 2011; Honda Pilot ES-RES[24]**
- My new honda pilot has been in the shop 3 different times for paint issues. Now I just found another spot that is chipping.

- **Lindsey T; December 28, 2012; 2009 Honda Odyssey Touring**
- There was a paint peeling next to the moon roof when the vehicle was purchased. The dealer fixed this at no charge. Now there are 2 other spots peeling down to metal, on each side of the vehicle just above the door on the frame. First started on the passenger side about a year ago, and just last week started on the driver side. Clearly this is not an area of "normal wear and tear", and an issue with the paint.
For the price and year of the vehicle, this is not acceptable. I take good care of my vehicles and am very disgusted with the way the peeling paint makes my vehicle look. Not to mention what it says about Honda, whose vehicles I love and own 2 of! Of course, there is nothing being done about it.[25]

- **Balaji B.; Nov. 1, 2013;2011 Odyssey LX[26]**
- I purchased a 2011 White Honda Odyssey from a small time dealer on Nov 2012. I observed that the roof of the car had its paint peeling off after about a year 2013 Nov. I went to a reputed dealer, who acknowledged the paint issues with Honda but told that 2011 models are not one of those. He contacted Honda and came back with an offer of $400 to cover the paint issues. But that would no way cut it and I feel cheated and ripped to have bought a Honda. Will never by [sic] a Honda again

---

[23] https://www.carcomplaints.com/Honda/Odyssey/2009/body_paint/clearcoat_peeling.shtml.
[24] https://www.carcomplaints.com/Honda/Pilot/2011/body_paint/paint_chipping_easily.shtml
[25] https://www.carcomplaints.com/Honda/Odyssey/2009/body_paint/paint_peeling-2.shtml.
[26] https://www.carcomplaints.com/Honda/Odyssey/2011/body_paint/peeling_paint_on_roof.shtml.

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

101. To be sure, Honda was aware of the Paint Defect prior to Plaintiffs' and Class members' purchases based on prior internal testing and prior TSBs. Early reports of the Paint Defect, and substantially similar paint issues, in prior makes and models of the Class Vehicles, including the sample of early-made complaints above, confirmed what Honda already knew about the latent paint defect by the beginning of the relevant time (late 2012). As the relevant time progressed, Honda no doubt increasingly received or was aware of complaints made directly to Honda or its authorized dealers or on websites closely monitored by Honda. By the time Plaintiffs purchased their Class Vehicles (late 2013, late 2017, 2019, and 2020), Honda received hundreds if not thousands of complaints of the Paint Defect affecting the Class Vehicles.

iv.    *Canadian Class Action Lawsuit*

102.   Honda also knew or should have known about the Paint Defect because of complaints of substantially similar paint issues impacting Canadian Honda vehicles, complaints ultimately resulting in a class action lawsuit being filed against Honda Canada, Inc. in Quebec, Canada Superior Court on May 4, 2018, *Stéphanie Daunais v. Honda Canada Inc.*, No. 500-06-000927-182.

103.   The Canadian class action was brought on behalf of all persons who purchased or leased a Honda Civic, Accord, CR-V, Odyssey, or Pilot whose paint experienced peeling (delamination). Among other things, the Canadian class action against Honda alleged a "phenomenon" of paint peeling affecting Honda vehicles throughout North America.

104.   In April 2022, the plaintiffs in the Canadian case and Honda Canada, Inc. settled the lawsuit on a class-wide basis. The settlement, approved in May 2022, allowed eligible claimants to receive compensation for costs associated with repainting due to peeling or delaminating paint, including:

- Reimbursement of up to CAD $2,550 for repainting the vehicle.

- Cash compensation of up to CAD $1,530 if they choose not to repaint.

- Compensation for previously completed repainting work.
- Reimbursement if they experienced a loss in resale value due to the paint issues.

The claims period began in September 2022 and extended until March 31, 2023, with up to $27 million available for eligible claims.

105.  Despite its various sources of pre-sale knowledge of the Paint Defect, Honda marketed the Class Vehicles to Plaintiffs at premium based on purported durability, high value, and ability retain value even though it knew that the Paint Defect would severely impact those attributes for the Class Vehicles during their reasonably expected life.

106.  Moreover, despite its pre-sale knowledge of the Paint Defect prior to Plaintiffs' and Class members' purchases of the Class Vehicles, Honda never disclosed the latent Paint Defect to Class Members prior or during their purchases of the Class Vehicles, despite a duty to do so.

**E.    Honda Had a Duty to Disclose the Paint Defect before It Sold Class Vehicles to Plaintiffs and Class Members**

107.  From at least the beginning of the relevant time (late 2012 to the present), Honda had a duty to disclose to consumers, including Plaintiffs, that the Class Vehicles had a latent Paint Defect which caused their white paint to prematurely fail, bubble, peel, delaminate, and flake during the reasonably expected life of the Class Vehicle.

108.  During the relevant time, Honda possessed exclusive and superior knowledge, not discoverable by Plaintiffs (including through reasonable inspection), regarding the Paint Defect, garnered through internal testing; prior substantially similar paint defects and TSBs related to those paint defects; widespread consumer reports directly to Honda and its authorized dealers and online sources closely monitored by Honda, and at least one substantially similar lawsuit. Therefore, Honda had a duty to disclose its superior knowledge of the Paint Defect but did not disclose that information to wrongly protect its business and bottom line.

109.  During  the  relevant  time,  Honda  made  incomplete  and  false

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

representations that required a corrective and complete disclosure regarding the Paint Defect, and the sources of pre-sale knowledge that revealed the Paint Defect to Honda. Among other things, Honda represented in Product brochures, press releases, and other sources that the Class Vehicles were high-value, stylish, luxurious, and durable, and would retain their value far better than competitor vehicles. However, Honda failed to disclose that the latent Paint Defect was a virtual inevitability which would severely impact the Class Vehicles' value, resale potential, and could result in costly repairs which would very likely fail to resolve the Paint Defect or restore the Class Vehicles to their bargained-for value.

110. Moreover, during the relevant timeframe, Honda actively concealed consumer reports of the Paint defect. Honda knew that if it disclosed that the Class Vehicles suffered from the latent Paint Defect, Plaintiffs and Classes members would not have purchased the Class Vehicles or would have paid far less for the Class Vehicles. To selfishly protect its business and bottom-line, Honda concealed the Paint defect in sales materials, television advertising, and other promotional channels.

111. Honda's misrepresentations and omissions were material because, when purchasing cars, Plaintiffs, Class members, and other reasonable consumers were very concerned with vehicle aesthetics, style, luxury, and design; durability and resale value; and the potential need for repairs. Plaintiffs, Class members, and other reasonable consumers would not expect the Paint Defect to arise during the reasonably expected useful life of the Class Vehicles.

112. Moreover, the quality of a vehicle's exterior paint is integral to a vehicle's use and function and safety by preventing rust and corrosion, and as acknowledged by Honda, a high quality exterior paint is needed to complement it vehicle design and aesthetics. Therefore, Honda had a duty to disclose that the Class Vehicles' white paint here could prematurely fail, bubble, peel, delaminate, and flake based on the Paint Defect.

1

2    **F.    Plaintiffs' Class Vehicle Purchases, Reliance on Honda's Representations**

3         **and Omissions, and Attempts to Seek Remedies From Honda**

4         *Plaintiff Clemmens*

5         113.    Plaintiff Jim Clemmens is a resident of Baltimore, Maryland and is a

6    citizen of Maryland. In 2019, Mr. Clemmens purchased a Certified Pre-Owned

7    ("CPO") 2016 Acura MDX in White Diamond Pearl paint from Montgomery Acura,

8    an authorized Acura dealer located at 1009 Bethlehem Pike, Montgomery,

9    Pennsylvania 18936. On the Acura website, Honda states that "[e]very Acura [CPO]

10   Vehicle is meticulously inspected inside and out – the first step in creating the ultimate

11   luxury experience backed by incredible benefits."[27] Mr. Clemmens paid approximately

12   $34,000 for the Class Vehicle.

13        114.    Prior to purchasing the Class Vehicle, Mr. Clemmens viewed marketing

14   materials that touted the quality, durability, and value of Honda's vehicles, including

15   the Class Vehicle, and the sales representative and/or other personnel at Montgomery

16   Acura emphasized the quality, durability, and aesthetic features of the Class Vehicle,

17   as well as the quality of Honda's used vehicles.

18        115.    Mr. Clemmens relied on the information regarding the quality, durability,

19   and value of the Class Vehicle conveyed in those marketing materials, as well as by

20   the sales representative and/or other personnel, in deciding to purchase his Class

21   Vehicle. Moreover, Mr. Clemmens specifically wanted to purchase a vehicle in a white

22   color, and the availability of the MDX in White Diamond Pearl was a material factor

23   in his decision to purchase his Class Vehicle.

24        116.    Honda failed to disclose the Paint Defect to consumers, including Mr.

25   Clemmens and other members of the Class, and Mr. Clemmens, therefore, purchased

26   his Class Vehicle on the reasonable, but mistaken, belief that it would be a quality and

27   durable vehicle that would retain its value. Mr. Clemmens would not have purchased

28

---

[27] https://www.acuracertified.com/certified-preowned-benefits.

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

the Class Vehicle, or would not have paid as much for it, had he known of the Paint Defect and the propensity of the paint to bubble, peel, delaminate, and flake off the Class Vehicle.

117.  In or about Summer 2024, Mr. Clemmens noticed that his Acura MDX's paint was failing, bubbling, peeling, delaminating and/or flaking, between the sunroof and the front windshield, one of the most common areas for the Paint Defect to arise on the Class Vehicles (something Honda acknowledged in its 2019 TSBs):



CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL



118.   Mr. Clemmens properly maintained his Class Vehicle, and the paint issue between his sunroof and front window cannot be the result of any other factor except the Paint Defect.

119.   In or about Summer 2024, Mr. Clemmens brought his Class Vehicle into AutoNation Acura Hunt Valley 0400 York Rd, Cockeysville, MD 21030, an authorized Acura dealer, seeking to repair his Class Vehicle. AutoNation Acura stated a repair would not be covered under Honda's extended warranty, refused to repair the Class Vehicle, and instructed Mr. Clemmens to reach out to Acura customer relations for assistance with the Paint Defect.

120.   In or about Summer 2024, Mr. Clemmens reached out to Acura Customer relations and provided a picture of the Paint Defect and a repair quote from a local autobody mechanic (who acknowledged he had frequently seen Class Vehicles impacted by the Paint Defect) of $2,365.

121.   After various communications with Acura customer relations and repeated demands from Mr. Clemmens, Acura asserted that the repair was not covered by the extended warranty and refused to repair the Paint Defect or pay to repair the Paint

Defect. Mr. Clemmens has not yet repaired the Paint Defect (to the extent it can be repaired).

122.  Mr. Clemmens has suffered a concrete and ascertainable loss as a direct and proximate result of Honda's misconduct in that Mr. Clemmens overpaid for his Class Vehicle at the time of purchase, the value of his Class Vehicle has been diminished as a result of the Paint Defect, and he will have to pay out-of-pocket to repair a latent Paint Defect Honda was well aware of at the time of sale.

*Plaintiff Hernandez*

123.  Plaintiff Terri Hernandez is a resident of Chula Vista, California. In late 2017, Ms. Hernandez leased a new 2017 Acura MDX in White Diamond Pearl paint from Hoehn Motors, an authorized Honda dealer located at 5550 Paseo Del Norte, Carlsbad, CA 92008. In late 2020, Ms. Hernandez purchased the 2017 Acura MDX from Hoehn. Ms. Hernandez paid approximately $50,000 to lease and then purchase the Class Vehicle.

124.  Prior to purchasing the Class Vehicle, Ms. Hernandez viewed marketing materials that touted the quality, durability, and value of Honda's vehicles, including the Class Vehicle, and the sales representative and/or other personnel at Hoehn Honda emphasized the quality, durability, and aesthetic features of the Class Vehicle.

125.  Ms. Hernandez relied on the information regarding the quality, durability, and value of the Class Vehicle conveyed in those marketing materials, as well as by the sales representative and/or other personnel, in deciding to purchase her Class Vehicle.  Moreover, Ms. Hernandez specifically wanted to purchase a vehicle in a white color, and the availability of the MDX in White Diamond Pearl was a material factor in her decision to purchase her Class Vehicle.

126.  Honda failed to disclose the Paint Defect to consumers, including Ms. Hernandez and other members of the Class, and Ms. Hernandez, therefore, purchased her Class Vehicle on the reasonable, but mistaken, belief that it would be a quality and durable vehicle that would retain its value.  Ms. Hernandez would not have purchased

the Class Vehicle, or would not have paid as much for it, had she known of the Paint Defect and the propensity of the paint to bubble, peel, delaminate and flake off the Class Vehicle.

127.  In or about Spring 2024, Ms. Hernandez noticed that her Acura MDX's paint was failing, bubbling, peeling, delaminating and/or flaking by the rear/tailgate area of the Class Vehicle, one of the most common areas for the Paint Defect to arise on the Class Vehicles (something Honda acknowledged in its 2019 TSBs):



128.  Ms. Hernandez properly maintained her Class Vehicle, and the paint issue on her Class Vehicle's tailgate cannot be the result of any other factor except the Paint Defect.

129.  In or about Spring/Summer/Fall 2024, Ms. Hernandez reached out to Acura Customer Relations and brought her Class Vehicle into Ball Acura, 2001 National City Boulevard, National City, CA 91950, an authorized Acura dealer,

seeking to repair her Class Vehicle. Ball Acura acknowledged the Paint Defect was a widespread issue, stated it could not repair Ms. Hernandez's vehicle, but referred Ms. Hernandez to an affiliated body shop for further assistance.

130.  In Summer/Fall 2024, the affiliated body shop repainted the Paint Defect and charged Ms. Hernandez approximately $680 out-of-pocket to repaint the Paint Defect. Ms. Hernandez decided to repaint the Paint Defect, despite the steep out-of-pocket, costs to prevent rusting and corrosion and to preserve the aesthetics of the Class Vehicle.

131.  In Spring/Summer/Fall 2024, Ms. Hernandez reached out to Acura Customer relations repeatedly demanding that Honda cover the full cost of repainting her Class Vehicle. After various communications with Acura customer relations, Honda asserted that the repair was not covered by the extended warranty, and Honda refused to reimburse Ms. Hernandez the full cost of the repair, leaving Ms. Hernandez with $680 in out-of-pocket expenses for the repainting.

132.  Repainting Ms. Hernandez's Class Vehicle did not remedy the Paint Defect. Even if her Class Vehicle's tailgate was repainted properly (which is not clear at this early stage), the Class Vehicle's latent Paint Defect will very likely manifest on other parts of the Class Vehicle. Moreover, repainting Ms. Hernandez's Class Vehicle did not restore the Class Vehicle to the value it would have had without the Paint Defect (and as bargained for by Ms. Hernandez) and repainting the Class Vehicle has permanently reduced her Class Vehicle's value.

133.  Ms. Hernandez has suffered a concrete and ascertainable loss as a direct and proximate result of Honda's misconduct in that Ms. Hernandez overpaid for her Class Vehicle at the time of purchase, the value of her Class Vehicle has been diminished as a result of the Paint Defect, and she has paid out-of-pocket costs to repair a latent Paint Defect Honda was well aware of at the time of lease and sale.

*Plaintiff Toussaint*

134.  Plaintiff Marie Toussaint is a resident of Haverstraw, New York and is a

citizen of New York. In late 2013, Ms. Toussaint purchased a new 2014 Acura MDX in White Diamond Pearl paint from Acura of Ramsey, an authorized Acura dealer located at 65 Route 17 South Ramsey, New Jersey 07446. Ms. Toussaint paid between $41,000 to $42,000 for the Class Vehicle.

135.  Prior to purchasing the Class Vehicle, Ms. Toussaint viewed marketing materials that touted the quality, durability, and value of Honda's vehicles, including the Class Vehicle, and the sales representative and/or other personnel at Hoehn Honda emphasized the quality, durability, and aesthetic features of the Class Vehicle.

136.  Ms. Toussaint relied on the information regarding the quality, durability, and value of the Class Vehicle conveyed in those marketing materials, as well as by the sales representative and/or other personnel, in deciding to purchase his Class Vehicle.  Moreover, Ms. Toussaint specifically wanted to purchase a vehicle in a white color, and the availability of the MDX in White Diamond Pearl was a material factor in her decision to purchase her Class Vehicle.

137.  Honda failed to disclose the Paint Defect to consumers, including Ms. Toussaint and other members of the Class, and Ms. Toussaint, therefore, purchased her Class Vehicle on the reasonable, but mistaken, belief that it would be a quality and durable vehicle that would retain its value.  Ms. Toussaint would not have purchased the Class Vehicle, or would not have paid as much for it, had she known of the Paint Defect and the propensity of the paint to bubble, peel, delaminate and flake off the Class Vehicle.

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

138.  In or about Summer 2018, Ms. Toussaint noticed that her Acura MDX's paint was failing, bubbling, peeling, delaminating and/or flaking by sunroof area of the Class Vehicle, one of the most common areas for the Paint Defect to arise on the Class Vehicles (something Honda acknowledged in its 2019 TSBs):



139.  In or about Summer 2018, Ms. Toussaint brought her Class Vehicle to Acura of Ramsey, which agreed to repair the Paint Defect. However, Acura of Ramsey's repair of the Paint Defect was inadequate and did not fully resolve the latent Paint Defect throughout Ms. Toussaint's Class Vehicle.

140.  In or about Summer 2024, Ms. Toussaint again noticed that her Acura MDX's paint was failing, bubbling, peeling, delaminating and/or flaking, this time by the rear/tailgate area of the Class Vehicle, one of the most common areas for the Paint Defect to arise on the Class Vehicles (something Honda acknowledged in its 2019 TSBs):

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28





141.  Ms. Toussaint properly maintained her Class Vehicle, and the paint issue by the rear/tailgate area of her Class Vehicle cannot be the result of any other factor except the Paint Defect.

142.  In or about Summer 2024, Ms. Toussaint brought her Class Vehicle to

Acura of Ramsey, again seeking to repair her Class Vehicle. Acura of Ramsey stated a repair would not be covered under Honda's extended warranty and refused to repair the Class Vehicle.

143.  In or about Summer 2024, Ms. Toussaint reached out to Acura Customer relations. After various communications with Acura customer relations, Honda asserted that the repair was not covered by the extended warranty and refused to repair or to pay to repair the Paint Defect. Ms. Toussaint has not yet repaired the Paint Defect (to the extent it can be repaired), but a repair of the Paint Defect would likely cost $2,500.

144.  Ms. Toussaint has suffered a concrete and ascertainable loss as a direct and proximate result of Honda's misconduct in that Ms. Toussaint overpaid for her Class Vehicle at the time of purchase, the value of her Class Vehicle has been diminished as a result of the Paint Defect, and she will have to pay out-of-pocket to repair a latent Paint Defect Honda was well aware of at the time of sale.

**G.    Plaintiffs and Class Members Suffered Damages Caused by the Paint Defect**

145.  Plaintiffs and Class members purchased the Class Vehicles based on their reasonable but mistaken belief that their Class Vehicles were of high quality, durable, and free of defects.  However, the Class Vehicles delivered by Honda were not those for which Plaintiffs and Class members bargained.  Rather, the Class Vehicles suffered from a common defect – the Paint Defect.  Had Plaintiffs and Class members known of the Paint Defect, they would have either: (a) paid substantially less for the Class Vehicles; (b) required an immediate remedy that restored the Class Vehicles to the conditions bargained for; or (c) not purchased or leased the Class Vehicles.

146.  As a result of the disparity between the quality of the Class Vehicles negotiated for and the Class Vehicles actually received, Plaintiffs and Class members suffered economic harm.  This economic harm can be quantified as: (a) the economic value of an effective remedy that restores the Class Vehicles to their expected conditions (or the economic harm from the lack of that remedy); (b) the discount that

Plaintiffs and Class members would have required to accept the Class Vehicles in their actual condition; and/or (c) the diminished value of the Class Vehicles, both those that have been repainted and those that have not.

147. Plaintiffs and Class members paid premiums to purchase the Class Vehicles because of the brand, quality, durability, and value representations made by Honda. A vehicle purchased or leased with the reasonable expectation that it is of high quality and durable as advertised is worth more than a vehicle known to be subject to the problems or risks associated with the Paint Defect. Plaintiffs and Class members were harmed from the day they drove their Class Vehicles off the lot because they did not get what they paid for – a high-quality and durable vehicle that would retain its value under normal conditions.

148. As a direct result of Honda's misrepresentations and omissions, Plaintiffs and Class members overpaid for their Class Vehicles and did not receive the benefit of their bargain. Plaintiffs and Class members paid a premium for the Class Vehicles, which Honda advertised as being durable and of high-quality and received Class Vehicles that contained a known but concealed Paint Defect. Honda was unjustly enriched because it obtained and retained monies paid by Plaintiffs and Class members who paid a price for the Class Vehicles that was higher than the value of the vehicles they received in return.

149. In addition, the widespread disclosure of the Paint Defect has caused a decrease in the value of the Class Vehicles, and, therefore, Plaintiffs and Class members have suffered a direct pecuniary loss in the form of the decreased value of their Class Vehicles, even when the Paint Defect has not yet manifested.

150. As a result of Honda's unfair, deceptive, and/or fraudulent business practices, and its failure to disclose the Paint Defect and the problems associated therewith, owners and lessees of the Class Vehicles have suffered losses in money and/or property.

**H.    The Class Vehicles' Warranties Were Unconscionable and/or Fraudulent**

151.  Honda sold the Honda Class Vehicles with a "New Vehicle Limited Warranty" ("NVLW") which provided coverage for 3 years or 36,000 miles, whichever came first. Honda sold Acura Class Vehicles with an NVLW which provided coverage for 4 years or 50,000, whichever comes first.

152. The Class Vehicles' NVLW provides in substantially similar fashion:

> Honda will repair or replace any part that is defective in material or workmanship under normal use. See Proper Operation on page 35. All repairs/replacements made under this warranty are free of charge. The replaced or repaired parts are covered only until this New Vehicle Limited Warranty expires.

153. The Class Vehicles NVLW also provides:

> Honda may cover, on a case-by-case basis, some or all of the cost to repair a problem that is not covered by your vehicle's limited warranties.

154.  CPO Class Vehicles also come with limited warranty coverage, but the limited warranty coverage Honda provides for CPO Class Vehicles "does not cover any item concerning the including cleaning, polishing, normal wear, and deterioration of any part" including paint.

155.  According to Honda, the CPO vehicle limited warranty excludes paint because "[t]he vehicle[s were] inspected before delivery and, at that time, met the standards required of [Honda/Acura] Certified Pre-Owned Vehicles."

156.  TBS 19-029, 19-055, and 19-064 provided extended warranty coverage for certain Class Vehicles impacted by the Paint Defect, including 2014-2016 Acura MDXes in White Diamond Pearl; 2013 Honda Odysseys and 2013-2015 Honda Pilots in Taffeta White; and 2015-2018 Honda Fits and 2016-2018 Honda HR-Vs in White Orchid Pearl or Bellanova White (two colors which have the same paint code NH-788P). Honda extended the warranty covering the Paint Defect for 7 years from the original date of purchase for Honda Class Vehicles and 8 years from the date of original

purchase for Acura Class Vehicles.

157. Honda's warranties and TBS extended warranties were unconscionable and fraudulent because:

- Honda leveraged its vastly unequal bargaining power to knowingly sell Class Vehicles with uniform Paint Defects, which caused the Class Vehicles' paint to fail, bubble, peel, delaminate, and flake. Despite its vastly superior position and its exclusive knowledge, Honda failed to inform Plaintiffs and Class members of the defect and misrepresented the reliability, quality, performance, and qualities of the Class Vehicles. Instead of informing Plaintiffs and the Class of the Products' known Paint Defect that that made the Class Vehicles inevitably susceptible to paint failure bubbling, peeling, delaminating, and flaking, Honda attempted to limit its warranty and Plaintiffs' warranty and other remedies. The limited remedies Honda offered unreasonably favor Honda given its superior and exclusive knowledge regarding the Paint Defect, and contravene the reasonable expectations of Plaintiffs and Class members concerning the performance of the Paint Defect.

- Honda knowingly limited the NVLW warranties by duration to avoid addressing the vast bulk of Paint Defect claims. Although the latent Paint Defect existed during the NVLW's period, Honda understood the majority of Class Vehicles would not manifest the Paint Defect until after the NVLW warranty period;

- Honda's warranties include misrepresentations and improper exclusions covering the known Paint Defect, including the CPO vehicle warranty which states "[CPO] vehicle[s were] inspected before delivery and, at that time, met the standards required of [Honda/Acura] Certified Pre-Owned Vehicles" even though Honda knew that all CPO Class Vehicles included the latent Paint Defect;

- The TBS extended warranties were improperly and knowingly limited by duration, certain Class Vehicle model years and certain white paint colors to avoid the bulk of claims. Although the latent Paint Defect existed during the extended warranty period, Honda understood the vast majority of Class Vehicles would not manifest the Paint Defect until after the TBS extended warranty period and would manifest in other Class Vehicles, the majority of which were not covered by Honda's TBS extended warranties;

- Repairs, even when provided pursuant to warranties, did not adequately address and remedy the Paint Defect; and

- Honda failed to provide adequate notice of the extended warranty to impacted Class members despite stating it would provide such notice, depriving Class members—including Plaintiff who were never notified of the TBS extended warranties–with a reasonable opportunity to avail themselves of the warranty; and

- Many impacted Class members have had their claims rejected improperly and arbitrarily by Honda under the TBS extended warranties, even where their Class Vehicles qualified for coverage under the plain terms of the TBS extended warranties.

158.  As evidenced by the repair instructions in the TSB, as well as the experiences of Plaintiffs (including Plaintiff Toussaint), repainting the Class Vehicles, even if done properly, does not remedy the Paint Defect and does not remedy the diminution of value that occurs because of the repainting.

159.  For all the Class Vehicles, the factory paint was applied by robots to exacting tolerances consistently over all body panels—a point highlighted by Honda when marketing the Vehicles to customers—whereas the TSB repair process is haphazard at best and results in paint inconsistencies relative to appearance and longevity.

160.  Indeed, the repainting of a Class Vehicle—that has been exposed to environmental elements during its use—using the TSB repair process could never achieve the same finish that is produced during the original painting of the Vehicle given the equipment and methods used by Honda in the paint system that is applied to the pristine body of a Class Vehicle, not to mention the pristine and strictly controlled environment in which the paint system is applied.  Thus, it is the limited scope of the TSB's repair procedures, the environment in which the Class Vehicles are repaired, and the limitations of body shops, including those who are certified by Honda, that all but assures that the quality of re-painting can never be as good as the original paint job. Honda knew that the TSB repair procedures were inadequate at the time they were first implemented, especially considering the environmental and technical limitations of the body shops it authorized to perform such repairs yet concealed that fact from the Class.

161.  Even if the Class Vehicles were properly repainted, their values would still

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

be diminished, as repainted newer vehicles are worth less than vehicles with original paint. Indeed, there is a stigma associated with a repainted vehicle, especially from a luxury brand like Acura, and the fact that a vehicle has been repainted is often used by a potential buyer as a bargaining chip to lower the price

162. In addition, anticipated car purchasers often shy away from a vehicle that has been repainted, as it rings alarm bells that the vehicle may have been damaged in an accident and repainted as a result. A non-original paint job could also be an indication of major body repairs to the Class Vehicle that are being hidden, not to mention rust.

163. According to an online poll conducted by CarMax, 72% of respondents said that repainting the car is the strongest indicator of vehicle damage.18 In fact, CarMax states that repainting is one of the biggest warning signs indicating a vehicle may have been in a major accident, and instructs consumers to do the following in order to determine whether a used car may have been in a serious accident:

> Look for signs of repainting on the car, such as inconsistency in the paintwork or paint on the molding or gaskets. Run your finger along the inside of the door edge and see if the finish is smooth or rough. A rough finish can be caused by overspray during repainting. If signs of repainting are found, ask additional questions to determine if the paintwork was for minor scratches and dents or to cover up more serious vehicle damage.[28]

164. CarMax's vehicle appraisals are determined, among other criteria, by its inspection of a "car's condition both inside and out," and it notes that "major defects" can impact their offers. CarMax significantly lowers the appraised values for vehicles, including the Class Vehicles, that have been repainted.

165. Kelley Blue Book ("KBB") similarly bases its appraisals on the condition

---

[28] CarMax, *Carmax.com "Quick Poll" Finds Consumers Often Misidentify Damage Indicators* (Apr. 28, 2008), http://investors.carmax.com/news-releases/news-releases-details/2008/VIDEO-CarMax-Offers-Tips-to-Spot-Hidden-Vehicle-Damage/default.aspx.

of the vehicle.  KBB divides the condition of used vehicles into the following four grades:

> **Excellent** condition means that the ***vehicle looks new***, is in excellent mechanical condition and needs no reconditioning. ***This vehicle has never had any paint or body work*** and is free of rust. The vehicle has a clean Title History and will pass a smog and safety inspection. The engine compartment is clean, with no fluid leaks and is free of any wear or visible defects. The vehicle also has complete and verifiable service records. Less than 5 percent of all used vehicles fall into this category.

> **Good** condition means that the vehicle is ***free of any major defects***. This vehicle has a clean Title History, the paint, ***body and interior have only minor (if any) blemishes***, and there are no major mechanical problems. There should be little or no rust on this vehicle. The tires match and have substantial tread wear left. A "good" vehicle will need some reconditioning to be sold at retail. Most consumer owned vehicles fall into this category.

> **Fair** condition means that the ***vehicle has some*** mechanical or ***cosmetic defects*** and needs servicing but is still in reasonable running condition. This vehicle has a clean Title History, ***the paint, body*** and/or interior ***need work performed by a professional***. The tires may need to be replaced. There may be some repairable rust damage.

> **Poor** condition means that the ***vehicle has severe*** mechanical and/or ***cosmetic defects*** and is in poor running condition. The vehicle may have problems that cannot be readily fixed such as a damaged frame or a rusted-through body. A vehicle with a branded title (salvage, flood, etc.) or unsubstantiated mileage is considered "poor." A vehicle in poor condition may require an independent appraisal to determine its value.

166.  According to KBB's online Condition Quiz, vehicles that have extensive paintwork and no paint damage are considered to be, at most, in "Good" condition, while vehicles that have no paintwork and extensive paint damage are considered to

be, at most, in "Fair" condition.

**I.    Fraudulent Concealment Allegations**

167.   Absent discovery, Plaintiffs are unaware of, and unable through reasonable investigation to obtain, the true names and identities of those individuals at Honda responsible for disseminating false and misleading marketing materials and information regarding the Class Vehicles.  Honda necessarily is in possession of, or has access to, all of this information,

168.   Plaintiffs' claims arise out of Honda's fraudulent concealment of the Paint Defect and the peeling, delaminating, flaking, and bubbling of the Class Vehicles' paint it causes, and its representations about the quality, durability, and value of the Class Vehicles, including the paint used on the Class Vehicles

169.   To the extent that Plaintiffs' claims arise from Honda's fraudulent concealment, there is no one document or communication, and no one interaction, upon which Plaintiffs base their claims.  Plaintiffs allege that at all relevant times, including specifically at the time they purchased their Class Vehicles, Honda knew, or was reckless in not knowing, of the Paint Defect; Honda was under a duty to disclose the Paint Defect based upon its exclusive knowledge of it, its affirmative representations about it, and its concealment of it, and Honda never disclosed the Paint Defect to Plaintiffs or the public at any time or place or in any manner.

170.   Plaintiffs make the following specific fraud allegations with as much specificity as possible although they do not have access to information necessarily available only to Honda:

171.   _Who:_ Honda actively concealed the Paint Defect from Plaintiffs and Class members while simultaneously touting the quality and durability of the Class Vehicles, as alleged above in paragraphs 27-46, 76-110, _supra_.  Plaintiffs are unaware of, and therefore unable to identify, the true names and identities of those specific individuals at Honda responsible for such decisions.

172.   _What_: Honda knew, or was reckless in not knowing, that the Class

Vehicles contain the Paint Defect, as alleged in paragraphs 63-101, *supra*. Honda concealed the Paint Defect and made contrary representations about the quality and durability, and other attributes of the Class Vehicles, as specified above in paragraphs 27-46, 76-110, *supra*.

173. *When*: Honda concealed material information regarding the Paint Defect at all times and made representations about the quality and durability of the Class Vehicles, starting no later than late 2012, or at the subsequent introduction of certain models of Class Vehicles to the market, continuing through the time of sale, and on an ongoing basis, and continuing to this day, as alleged above in paragraphs 27-46, *supra*. Honda has not disclosed the truth about the Paint Defect in the Class Vehicles to anyone outside of Honda. Honda has never taken any action to inform consumers about the true nature of the Paint Defect in Class Vehicles. And when consumers brought their Class Vehicles to Honda complaining of the Paint Defect, Honda denied any knowledge of, or responsibility for, the Paint Defect, and in many instances, actually blamed Class Members for causing the problem.

174. *Where*: Honda concealed material information regarding the true nature of the Paint Defect in every communication it had with Plaintiffs and Class members and made contrary representations about the quality and durability of the Class Vehicles. Plaintiffs are aware of no document, communication, or other place or thing in which Honda disclosed the truth about the Paint Defect in the Class Vehicles to anyone outside of Honda. Such information is not adequately disclosed in any sales documents, displays, advertisements, warranties, owner's manual, or on Honda's website.

175. *How*: Honda concealed the Paint Defect from Plaintiffs and Class Members and made representations about the quality and durability of the Class Vehicles. Honda actively concealed the truth about the existence and nature of the Paint Defect from Plaintiffs and Class members at all times, even though it knew about the Paint Defect and knew that information about the Paint Defect would be important to

a reasonable consumer, and Honda promised in its marketing materials that the Class Vehicles have qualities that they do not have.

176. *Why*: Honda actively concealed material information about the Paint Defect in Class Vehicles for the purpose of inducing Plaintiffs and Class members to purchase Class Vehicles, rather than purchasing or leasing competitors' vehicles and made representations about the quality and durability of the Class Vehicles and to earn additional revenue.  Had Honda disclosed the truth, for example in its advertisements or other materials or communications, Plaintiffs (and reasonable consumers) would have been aware of it, and would not have bought the Class Vehicles or would have paid less for them.

**J.    Tolling of the Statute of Limitations**

177.  *Fraudulent Concealment Tolling*: Honda has known of the Paint Defect in the Class Vehicles since at least late 2012, and has concealed from, or failed to, notify Plaintiffs, Class members, and the public of the full and complete nature of the Paint Defect, even when directly asked about it by Plaintiffs and Class members during communications with Honda, Honda/Acura Customer Relations, Honda/Acura dealerships, and Honda service centers.  Honda continues to conceal the Paint Defect to this day,

178.  Any applicable statute of limitation has been tolled by Honda's knowledge, active concealment, and denial of the facts alleged herein, which behavior is ongoing.

179.  *Estoppel*: Honda was, and is, under a continuous duty to disclose to Plaintiffs and Class members the true character, quality, and nature of the Class Vehicles.  Honda actively concealed – and continues to conceal – the true character, quality, and nature of the Class Vehicles and knowingly made representations about the quality and durability of the Class Vehicles.   Plaintiffs and Class members reasonably relied upon Honda's knowing and affirmative representations and/or active concealment of these facts.   Based on the foregoing, Honda is estopped from relying

on any statutes of limitation in defense of this action.

180.  *Discovery Rule*: The causes of action alleged herein did not accrue until Plaintiffs and Class members discovered that their Class Vehicles contained the Paint Defect.

181.  However, Plaintiffs and Class members had no realistic ability to discern that the Class Vehicles were defective until – at the earliest – after the Paint Defect caused their Class Vehicles' paint to prematurely fail, bubble, peel, delaminate, and flake during the reasonably expected life of the Class Vehicle.  Even then, Plaintiffs and Class members had no reason to know the peeling, flaking, and bubbling were caused by a defect in the Class Vehicles because of Honda's active concealment of the Paint Defect.   Not only did Honda fail to notify Plaintiffs or Class members about the Paint Defect, Honda, in fact, denied any knowledge of, or responsibility for, the Paint Defect when directly asked about it, and, in many instances, actually blamed the owner for causing the problem.

182.  Thus, Plaintiffs and Class members were not reasonably able to discover the Paint Defect until after they had purchased the Class Vehicles, despite their exercise of due diligence, and their causes of action did not accrue until, at earliest, they discovered that the Paint Defect caused their Class Vehicles' paint to prematurely fail, bubble, peel, delaminate, and flake during the reasonably expected life of the Class Vehicle.

## CLASS ACTION ALLEGATIONS

183. Plaintiffs seek to represent and certify the following class:

> **National Class**
> All persons or entities in the United States that purchased or leased a Class Vehicle.

> **California Class**
> All persons or entities in the state of California that purchased or leased a Class Vehicle.

> **Pennsylvania**
> All persons and entities in the state of Pennsylvania who

purchased or leased a Class Vehicle.

**New Jersey**

All persons and entities in the state of New Jersey who purchased or leased a Class Vehicle (the National and state classes are collectively referred to as the "Class" throughout this Complaint for ease of reference).

184.   The Class excludes any judge or magistrate assigned to this case, Honda, Honda's officers, directors, legal representatives, successors, and assigns, and any entity in which Honda has a controlling interest.

185.   Plaintiffs satisfy the requirements of Rule 23(a) and Rule 23(b).

186.   *Numerosity*:  This proposed class action involves at least tens of thousands of Class Vehicles. Although the exact numbers are unknown to Plaintiffs, the number of individuals in the Classes far exceed forty (40) individuals and very likely amount to tens of thousands of individuals. As a result, the Classes are so numerous that joinder of all members is impracticable.

187.   The proposed classes are defined by objective criteria so that it is administratively feasible for the Court to determine whether a particular individual is a member. Individual class members can be identified through affidavits and/or reference to documents in Honda's possession, custody, or control without resort to a mini-hearing on the merits.

188.   *Commonality*: The questions of law and fact common to Classes predominate over any questions which may affect individual members of those Classes and include:

    a.   Whether the Class Vehicles suffer from a latent Paint Defect;

    b.   When and how Honda knew or suspected the Class Vehicles had a latent Paint Defect;

    c.   Whether Honda adequately disclosed the Paint Defect to Plaintiffs and Class Members;

    d.   Whether Honda made false and/or misleading statements and omissions concerning the Class Vehicles and the Paint Defect;

e.  Whether Honda's conduct offended public policy without providing any countervailing benefits; and

f.  Whether Plaintiffs and the Class are entitled to actual and compensatory damages, restitution, and statutory damages.

189. _Typicality_: Plaintiffs' claims are typical of those belonging to members of the Classes. Each Plaintiff purchased or leased Class Vehicles with the latent Paint Defect and suffered economic damages as a result Rule 23(b)(1)

190. _Adequacy_: Plaintiffs will fairly and adequately protect the interests of Classes. Plaintiffs have retained counsel experienced in complex class action litigation, and Plaintiffs and their chosen counsel have no interests adverse to those of the Classes.

### _Rule 23(b)(1)_

191. Class action status is warranted under Rule 23(b)(1)(A). Prosecuting separate actions by or against individual members of the Classes would create a risk of inconsistent or varying adjudications with respect to individual members of the Classes, which would establish incompatible standards of conduct for Honda.

192. Class action status is also warranted under Rule 23(b)(1)(B). Prosecuting separate actions by individual members of the Classes would create a risk of adjudications with respect to individual class members which would, as a practical matter, be dispositive of the interests of the other members not parties to the adjudications, or substantially impair or impede their ability to protect their interests.

### _Rule 23(b)(2) – Declaratory Relief_

193. Rule 23(b)(2) of the Federal Rules of Civil Procedure: Honda has acted or refused to act on grounds generally applicable to Plaintiffs and Class members, thereby making appropriate declaratory relief, with respect to each Class as a whole.

### _Rule 23(b)(3) – Superiority_

194. Common questions of law and fact exist as to every member of the Classes and predominate over any questions solely affecting individual members of the Classes, including the common questions identified above paragraph 188, supra.

195.  A class action is also superior to other available means for the fair and efficient adjudication of this controversy for other reasons. The injuries suffered by individual members of the classes, though important to them, are relatively small compared to the burden and expense of individual prosecution needed to address Honda's misconduct. Individualized litigation presents a potential for inconsistent or contradictory judgments. In contrast, a class action presents far fewer management difficulties; allows the hearing of claims that might otherwise go unaddressed; and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court. Individual class member's interests in individually controlling the prosecution of separate actions are outweighed by their interest in efficient resolution by a single class action, and it would be desirable to concentrate in this single venue the litigation of all class members who were induced to purchase and use the contaminated Products and were injured by Honda's uniform misconduct.

196.  Plaintiffs cannot be certain of the form and manner of proposed notice to members of the Classes until the Classes are finally defined and discovery is completed regarding the identity of class members. Plaintiffs anticipate, however, that notice by mail will be given to members of the Classes who can be identified specifically. In addition, notice may be published in appropriate publications, on the internet, in press releases and in similar communications to reach members of the Classes.

197.  Plaintiffs reserve their right to modify or amend the definition of the proposed Classes and to assert additional subclasses at any time before the Classes are certified by the Court.

## FIRST CLAIM FOR RELIEF

### VIOLATION OF CALIFORNIA'S UNFAIR COMPETITION LAW

### (California Business and Professions Code §§ 17200 *et seq.*)

198.  Plaintiffs reallege and incorporate by reference the allegations elsewhere in the Complaint as if set forth fully herein.

199.  Plaintiffs bring this claim on behalf of themselves and the National Class.

200.  California Business and Professions Code §§ 17200 et seq., prohibits acts of unfair competition, including any "unlawful, unfair or fraudulent business act or practice."

201.  Honda engaged in unlawful business acts and practices in violation of California Business and Professions Code §§ 17200 et seq., by engaging in the false and misleading advertising specified elsewhere in this Complaint:

*Unlawful Business Practices*

202.  By proscribing "any unlawful" business practice, the UCL borrows violations of other laws and treats them as unlawful practices that the UCL makes independently actionable. The acts, omissions, misrepresentations, practices, and non-disclosures of Honda as alleged herein constitute "unlawful" business acts and practices in that Honda's conduct violates (at least):

- California's False Advertising Law, Cal. Bus. & Prof. Code §§ 17500 et seq.;
- California's Consumer Legal Remedies Act, Cal. Civ. Code § 1750 et seq.; and

*Unfair Business Practices*

203.  California Business and Professions Code §§ 17200 et seq., prohibits acts of unfair competition. Unfair competition includes (a) conduct tethered to any underlying constitutional, statutory or regulatory provision; (b) conduct that offends public policy or is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers; or (c) conduct with an injurious impact on the victim that outweighs the reasons, justifications and motives of the alleged wrongdoer.

204.  Here, Honda's misconduct violates the "unfair" prong of the UCL. Honda knew of and consciously disregarded or downplayed and falsely minimized the readily foreseeable risk that the Class Vehicles paint would fail, peel, delaminate, or flake as a result of the Paint Defect.

205.  By ignoring those risks, Honda manufactured and placed into the stream

of commerce tens or hundreds of thousands of Class Vehicles with the latent Paint Defect. Moreover, Honda misrepresented and omitted material information regarding the Class Vehicles' design, aesthetic, value, and durability without indicating to consumers in any way that the Class Vehicle would almost certainly experience the Paint Defect.

206. Honda's misconduct caused consumers, including Plaintiffs, to buy overpriced Class Vehicles and suffer other economic losses described above.

207. Honda's misconduct was tethered to underlying statutory and regulatory violations; offended publicly; and was unfair and substantially injurious to Plaintiffs and the Class. Honda's misconduct is not outweighed by any countervailing benefits to consumers or competition, and Plaintiffs and the Class suffered injuries that could not be avoided because of Honda's subterfuge.

### *Fraudulent Business Acts or Practices*

208. California Business and Professions Code §§ 17200 et seq., prohibits fraudulent business acts or practices.

209. The UCL prohibits fraudulent and misleading business acts and practices and business acts or practices that although technically true either mislead or which have a capacity, likelihood, or tendency to deceive or confuse the public.

210. The UCL also prohibits omissions/non-disclosures that are contrary to representations actually made or omissions/non-disclosures that a Honda was obligated to disclose, including in instances where (a) the defendant is in a fiduciary relationship with the plaintiff; (b) when the defendant has exclusive knowledge of material facts not known to the plaintiff; (c) when the defendant actively conceals a material fact from the plaintiff; and (d) when the defendant makes partial representations but also suppresses some material facts.

211. Here, the false and misleading advertising of the Class Vehicles, as alleged herein, constitutes "fraudulent" business acts and practices because members of the consuming public, including Plaintiffs and the Class were deceived by the false and

misleading advertising described elsewhere in the Complaint.

212.  At least as early as the beginning of the relevant time (late 2012), Honda understood the unreasonable risk that the Class Vehicles' paint would fail due to the Paint Defect due to internal testing, prior TBSs, consumer complaints, and at least one other lawsuit. Despite that knowledge and Honda's duty to disclose the Paint Defect, it did not reveal the truth to Plaintiffs and other Class members.

213.  At least as early as the beginning of the relevant time, Honda consciously ignored those risks and/or intentionally and fraudulently downplayed and falsely minimized those risks to reduce costs, induce substantial purchases by unsuspecting consumers, prevent a steep decline or total cessation in sales, greatly inflate profits, and avoid tens of millions of dollars of exposure and liability once the truth was revealed.

214.  During the relevant times, Honda represented through an extensive nationwide advertising campaign that the Class Vehicles were high-value, value-retaining, luxurious and stylish, durable, and high-quality vehicles. Those representations were false and or misleading because, during the relevant time, the Class Vehicles suffered from the latent Paint Defect which would and will inevitably cause paint failure, peeling, delaminating, and flaking.

215.  Honda's omissions/non-disclosures are also material and actionable under the UCL. Honda's omissions were contrary to representations already made or Honda had a duty to disclose the Paint Defect because: (a) Honda had exclusive and superior knowledge of those Paint Defect not known to Plaintiffs; (b) Honda actively concealed those risks from Plaintiffs; and (c) Honda makes partial representations regarding the Class Vehicles while suppressing facts concerning the Class Vehicles' Paint Defect. Honda's omissions/non-disclosures were material because they related to Class Vehicles integral function, design, purposes, and safety.

216.  Honda leveraged its deception to induce Plaintiffs and the Class to purchase Class Vehicles that were of lesser value and quality than advertised. Plaintiffs and the Class reviewed and relied on Honda's representations and omissions and were

denied the benefit of the bargain when they decided to purchase the Class Vehicles over competitor vehicles which did not have the Paint Defect. Had Honda not made false and misleading statements and used false and misleading advertising tactics, Plaintiffs and the Class would have paid far less than what they did for the Class Vehicles or would not have purchased the Class Vehicles at all, among other economic injuries.

217. The foregoing acts and practices have detrimentally impacted competition and caused substantial harm to Plaintiffs, the Class, and the consuming public. Plaintiffs and Class members were misled and suffered injuries and lost money or property as a direct and proximate result of Handa's unlawful business practices.

218. By reason of the foregoing, Honda should be required to disgorge its illicit profits, make restitution to Plaintiffs and the Class, and pay for Plaintiffs' and the Class's attorneys' fees.

219. Plaintiffs reserve the right to identify additional provisions of law violated by Honda as further investigation and discovery warrants.

## SECOND CLAIM FOR RELIEF

## VIOLATION OF THE CALIFORNIA FALSE ADVERTISING LAW

### (California Business and Professions Code §§ 17500 *et seq.*)

220. Plaintiffs reallege and incorporate by reference the allegations elsewhere in the Complaint as if set forth fully herein.

221. Plaintiffs bring this claim on behalf of themselves and the National Class and the California Class.

222. The FAL prohibits any "unfair, deceptive, untrue, or misleading advertising." Cal. Bus. and Prof. Code § 17500. The FAL prohibits not only advertising which is false, but also advertising which, although true, is either actually misleading or which has a capacity, likelihood or tendency to deceive or confuse the public.

223. Honda's acts and practices as described herein have deceived and/or are likely to deceive Plaintiffs, the Class, and the public. During the relevant time, Honda

engaged in a widespread national advertising campaign misrepresenting that the Class Vehicles were high-value, value-retaining, luxurious and stylish, durable, and high-quality vehicles even though the Class Vehicles suffered from a latent Paint Defect that would inevitably cause paint failure, peeling, delamination, and flaking.

224.   Furthermore, at least as early as the beginning of the relevant time, Honda understood the unreasonable risk that the Class Vehicles' paint would fail due to the Paint Defect due to internal testing, prior TBSs, consumer complaints, and at least one other lawsuit. Despite that knowledge and Honda's duty to disclose the Paint Defect, it did not reveal the truth to Plaintiffs and other Class members. The advertisements, labeling, policies, acts, and practices described herein were designed to, and did, result in the purchase and lease of the Class Vehicles without knowledge of the Paint Defect.

225.   The misrepresentations and omissions by Honda of the material facts detailed elsewhere in this Complaint constitute false and misleading advertising. Plaintiffs and the Class reviewed and relied on Honda's representations and omissions and were denied the benefit of the bargain when they decided to purchase the Class Vehicles over competitor vehicles which do not include the Paint Defect. Had Honda not made false and misleading statements and used false and misleading advertising tactics, Plaintiffs and the Class would have paid far less than what they did for the Class Vehicles or would not have purchased the Products at all, among other economic injuries.

226.   By reason of the foregoing, Honda should be required to disgorge its illicit profits, make restitution to Plaintiffs and Class, and pay for Plaintiffs' and the Class's attorneys' fees.

## **THIRD CLAIM FOR RELIEF**

### **VIOLATION OF THE CONSUMERS LEGAL REMEDIES ACT**
### **(California Civil Code §§ 1750 *et seq.*)**

227. Plaintiffs reallege and incorporate the allegations elsewhere in the Complaint as if set forth fully herein.

228. Plaintiffs bring this claim on behalf of themselves and the proposed National Class and the California Class.

229. The CLRA has adopted a statutory scheme prohibiting various deceptive practices in connection with the conduct of a business providing goods, property, or services primarily for personal, family, or household purposes.

230. Honda's policies, acts, and practices were intended to, and did, result in the purchase and use of the products primarily for personal, family, or household purposes, and violated and continue to violate at least the following sections of the CLRA:

- § 1770(a)(5): which proscribes "[r]epresenting that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities which they do not have";

- § 1770(a)(7) which proscribes "[r]epresenting that goods or services are of a particular standard, quality or grade"; and

- § 1770(a)(9): which proscribes "[a]dvertising goods or services with intent not to sell them as advertised."

231. As a proximate result of these violations by Honda, Plaintiffs and the Class have suffered harm and damages in an amount to be determined at trial.

232. At this time, Plaintiffs only seek an injunction pursuant to Cal. Civ. Code § 1782(d) enjoining Honda from continuing to employ the unlawful methods, acts, and practices alleged elsewhere in this Complaint, including Honda's continuing pattern and practice of denying repairs of the Paint Defect. If Honda is not restrained from engaging in these practices in the future, Plaintiffs and the Class will continue to suffer harm.

233. Plaintiffs intend to amend the Complaint to seek monetary relief in accordance with the CLRA after providing Honda with notice pursuant to Civil Code § 1782 on or about November 4, 2024

234. At the time of any amendment seeking damages under the CLRA, Plaintiffs will demonstrate that the violations of the CLRA were willful, oppressive, and fraudulent, thus supporting an award of exemplary damages.

235.  Consequently, Plaintiffs and the Class will be entitled to actual and exemplary damages against Honda for its violation of the CLRA. In addition, pursuant to Cal. Civ. Code § 1780(a)(2), Plaintiffs and the Class will be entitled to an order enjoining the above-described acts and practices, providing restitution to Plaintiffs and the Class, ordering payment of costs and attorneys' fees, and any other relief deemed appropriate and proper by the Court pursuant to California Civil Code § 1780.

## FOURTH CLAIM FOR RELIEF
## BREACH OF EXPRESS WARRANTY

236.  Plaintiffs reallege and incorporate the allegations elsewhere in the Complaint as if set forth fully herein.

237.  Plaintiff Clemmens bring this claim on behalf of himself and the proposed Pennsylvania Class.

238.  The Pennsylvania Class and Honda are "persons" within the meaning of 73 PA. CONS. STAT. ANN. §201-2(2).

239.  The Pennsylvania Class purchased or leased the Class Vehicles primarily for personal, family, or household purposes within the meaning of 73 PA. CONS. STAT. ANN. §201-9.2.

240.  All of the acts complained of herein were perpetrated by Honda in the course of trade or commerce within the meaning of 73 PA. CONS. STAT. ANN. §201-2(3).

241.  The Pennsylvania Unfair Trade Practices and Consumer Protection Law ("Pennsylvania CPL") prohibits unfair or deceptive acts or practices, including: (i) "Representing that goods or services have … characteristics, … Benefits or qualities that they do not have"; (ii) "Representing that goods or services are of a particular standard, quality or grade … if they are of another"; (iii) "Advertising goods or services with intent not to sell them as advertised"; and (iv) "Engaging in any other fraudulent or deceptive conduct which creates a likelihood of confusion or misunderstanding." 73 PA. CONS. STAT. ANN. §201-2(4).

242. In the course of its business, Honda violated the Pennsylvania CPL by knowingly misrepresenting and intentionally concealing material facts regarding the quality of the Class Vehicles and the quality and benefits of the paint and paint process used on the Class. Vehicles, as detailed above. Specifically, in marketing, offering for sale/lease, and selling/leasing the defective Class Vehicles, Honda engaged in one or more of the following unfair or deceptive acts or practices which are proscribed by the Pennsylvania CPL:

- representing that the Class Vehicles have characteristics or benefits that they do not have;
- representing that the Class Vehicles are of a particular standard and quality when they are not;
- advertising the Class Vehicles with the intent not to sell them as advertised; and/or
- Engaging in any other fraudulent or deceptive conduct which creates a likelihood of confusion or misunderstanding.

243. Honda's scheme and concealment of the true characteristics of the Class Vehicles were material to the Pennsylvania Class members, and Honda misrepresented, concealed, or failed to disclose the truth with the intention that the Pennsylvania Class members would rely on the misrepresentations, concealments, and omissions. Had they known the truth, the Pennsylvania Class members would not have purchased or leased the Class Vehicles, or would have paid significantly less for them.

244. The Pennsylvania Class members had no way of discerning that Honda's representations were false and misleading, or otherwise learning the facts that Honda had concealed or failed to disclose.

245. Honda had an ongoing duty to the Pennsylvania Class members to refrain from unfair and deceptive practices under the Pennsylvania CPL in the course of its business. Specifically, Honda owed the Pennsylvania Class members a duty to disclose all the material facts concerning the Class Vehicles because it possessed exclusive knowledge, it intentionally concealed such material facts from the Pennsylvania

Class members, and/or it made misrepresentations that were rendered misleading because they were contradicted by withheld facts.

246. The Pennsylvania Class members suffered ascertainable loss and actual damages as a direct and proximate result of Honda' concealment, misrepresentations, and/or failure to disclose material information.

247. Pursuant to 73 PA. CONS. STAT. ANN. §201-9.2(a), the Pennsylvania Class members seek an order awarding damages, treble damages, and any other just and proper relief available under the Pennsylvania CPL.

<u>**FIFTH CLAIM FOR RELIEF**</u>

**VIOLATION OF THE NEW JERSEY CONSUMER FRAUD ACT**
**(N.J. STAT. ANN. §56:8-1, ET SEQ.)**

248. Plaintiffs reallege and incorporate the allegations elsewhere in the Complaint as if set forth fully herein.

249. Plaintiff Toussaint bring this claim on behalf of herself and the proposed New Jersey Class.

250. Honda, Plaintiff, and the New Jersey Class members are "persons" within the meaning of N.J. STAT. ANN. §56:8-1(d). Honda engaged in "sales" of "merchandise" within the meaning of §56:8-1(c) and (e).

251. The New Jersey Consumer Fraud Act ("New Jersey CFA") makes unlawful "[t]he act, use or employment by any person of any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing concealment, suppression, or omission of any material fact with the intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise or real estate, or with the subsequent performance of such person as aforesaid, whether or not any person has in fact been misled, deceived or damaged thereby." N.J. STAT. ANN. §56:8-2.

252. In the course of its business, Honda violated the New Jersey CFA by knowingly misrepresenting and intentionally concealing material facts regarding the

quality of the Class Vehicles and the quality and benefits of the paint and paint process used on the Class Vehicles, as detailed above. Specifically, in marketing, offering for sale/lease, and selling/leasing the defective Class Vehicles, Honda engaged in one or more of the following unfair or deceptive acts or practices which are proscribed by the New Jersey CFA:

- representing that the Class Vehicles have characteristics or benefits that they do not have;

- representing that the Class Vehicles are of a particular standard and quality when they are not;

- advertising the Class Vehicles with the intent not to sell them as advertised; and/or;

- Engaging in any other fraudulent or deceptive conduct which creates a likelihood of confusion or misunderstanding.

253. Honda's scheme and concealment of the true characteristics of the Class Vehicles were material to the New Jersey Class members, and Honda misrepresented, concealed, or failed to disclose the truth with the intention that the New Jersey Class members would rely on the misrepresentations, concealments, and omissions. Had they known the truth, the New Jersey Class members would not have purchased or leased the Class Vehicles, or would have paid significantly less for them.

254. The New Jersey Class members had no way of discerning that Honda's representations were false and misleading, or otherwise learning the facts that Honda had concealed or failed to disclose.

255. Honda had an ongoing duty to the New Jersey Class members to refrain from unfair and deceptive practices under the New Jersey CPA in the course of its business. Specifically, Honda owed the New Jersey Class members a duty to disclose all the material facts concerning the Class Vehicles because it possessed exclusive knowledge, it intentionally concealed such material facts from the New Jersey Class members, and/or it made misrepresentations that were rendered misleading because they were contradicted by withheld facts.

256.  The New Jersey members suffered ascertainable loss and actual damages as a direct and proximate result of Honda' concealment, misrepresentations, and/or failure to disclose material information.

257.  Pursuant to N.J. STAT. ANN. §56:8-19, Plaintiff and the New Jersey Class members seek an order awarding damages, treble damages, and any other just and proper relief available under the New Jersey CFA.

## SIXTH CLAIM FOR RELIEF
## BREACH OF EXPRESS WARRANTY

258.  Plaintiffs reallege and incorporate the allegations elsewhere in the Complaint as if set forth fully herein.

259.  Plaintiffs bring this claim on behalf of herself and the proposed National Class.

260.  Honda is and was at all relevant times a "merchant" and "seller" with respect to the Class.

261.  With respect to leases, Honda is and was at all relevant times a "lessor" of motor vehicles.

262.  The Class Vehicles are and were at all relevant times "goods."

263.  In connection with the purchase or lease of all Class Vehicles, Honda provided Plaintiff and the Class with a written warranty covering defects in materials and workmanship of the Class Vehicles for three or four years, as well as TBS extended warranties for seven or eight years, as detailed above.  In addition, Honda's various oral and written representations regarding the quality of the Class Vehicles and the quality and benefits of the paint and paint process used on the Class Vehicles constituted express warranties to Plaintiff and Class members

264.  Honda's warranties formed a basis of the bargain that was reached when Plaintiff and the Class members purchased or leased their Class Vehicles.

265. Honda breached its express warranties (including the implied covenant of good faith and fair dealing) by: (a) knowingly providing Plaintiff and the Class

members with Class Vehicles containing defects in the materials and workmanship with regard to the paint and paint process used on the Class Vehicles that were never disclosed to Class members; (b) failing to repair or replace the defective Class Vehicles at no cost within the four- year warranty period; (c) ignoring, delaying responses to, and denying warranty claims in bad faith; and (d) supplying products and materials that failed to conform to the representations made by Honda.

266.  Thus, Honda's written warranties fail of their essential purpose and the recovery of Plaintiffs and Class members is not limited to its remedies.

267.  Plaintiff and Class members have given Honda a reasonable opportunity to cure its breaches of express warranty, including when Plaintiffs sought Paint Defect repairs from Honda directly and from Honda's agents (as described above) and demanded such repairs or reimbursement for such repairs. Furthermore, in an abundance of caution, on or about November 4, 2024, Plaintiffs each sent Honda a letter by certified first class mail, detailing its warranty breaches, demanding relief, and providing Honda an opportunity to cure.

268.  Alternatively, Plaintiffs and Class members were not required to provide Honda a notice an opportunity to cure because such an opportunity would be unnecessary and futile given that the Honda has previously and consistently refused to provide repairs and the repairs offered by Honda can neither cure the defect in the Class Vehicles nor resolve the incidental and consequential damages flowing therefrom.

269. Likewise, Honda was on notice of its warranty breaches through interactions with regulatory agencies and the issuance of the various TBSs; thousands of consumer complaints and attempted repairs of the Paint Defect; and from other external and internal sources, including internal testing, and a substantially similar lawsuit filed in Canada. Plaintiffs and the Class provided Honda with an opportunity to cure its breach of warranty, to no avail. Honda has refused to provide an adequate remedy for the Paint Defect

270.  Many Class members with Class Vehicles that have now manifested the

Paint Defect have learned of the futility of making a warranty claim for the Paint Defect or bringing in their Class Vehicle for a repair to address the Paint Defect, through online complaints and the experiences of others that have had their warranty claims denied and/or have had inadequate repairs made to their Vehicles. As a result, many Class members have decided to not present their Class Vehicles to Honda dealerships for warranty claims and/or repairs, a requirement from which Class members are excused considering the futility of Honda's purported remedies

271.   Plaintiffs and Class members were in privity of contract with Honda by virtue of their interactions with Honda and/or its retailers, who acted as Honda's agents.

272.   Alternatively, privity of contract need not be established, and is not required, because Honda is a manufacturer that provided a warranty directly to Plaintiffs or Class members or otherwise had direct contact with Plaintiffs and Class members. Similarly, Plaintiffs and Class members are the intended third-party beneficiaries of the warranties between Honda and the authorized dealers who sold the Class Vehicles. Honda's warranties were designed and intended for the benefit of consumers who purchased the Class Vehicles. Honda also made direct representations and omissions to Plaintiffs and the Class through its agents, in marketing materials, its website, on third-party websites and in advertisements

273.   Accordingly, Plaintiff and the Class members assert as additional and/or alternative remedies, the revocation of acceptance of the goods and the return to Plaintiff and the Class members of the purchase or lease price of all Class Vehicles currently owned and leased, and for such other incidental and consequential damages as allowed, in an amount to be determined at trial.

## SEVENTH CLAIM

### FRAUDULENT CONCEALMENT

274.   Plaintiffs reallege and incorporate the allegations elsewhere in the Complaint as if set forth fully herein.

275.   Plaintiffs bring this claim on behalf of herself and the proposed National

Class

276.  Honda fraudulently concealed and suppressed material facts concerning the quality of the Class Vehicles and the paint used thereon, as well as the existence of the Paint Defect.

277.  Despite advertising the Class Vehicles  as  durable and  being of high quality, Honda knew when it manufactured, marketed, and sold or leased the Vehicles that the paint used thereon suffered from a design and/or manufacturing defect that reduced the Class Vehicles' value and subjected the Class Vehicles to failing, peeling, delaminating, and flaking paint.

278.  Honda failed to disclose these facts to consumers at the time it manufactured, marketed, and sold or leased the Class Vehicles and Honda knowingly and intentionally engaged in this concealment in order to boost sales and revenue, maintain its competitive edge in the automobile market, and obtain windfall profit. Through its active concealment and/or suppression of these material facts, Honda sought to increase consumer confidence in the Class Vehicles, and to falsely assure purchasers and lessors of the same that the Vehicles were of sound  quality  and  that Honda was  a  reputable  manufacturer  that  stands  behind  the automobiles it manufactures.  Honda engaged in this behavior to protect its profits, avoid warranty replacements, avoid recalls that would impair the brand's image, cost it money, and undermine its competitiveness in the automobile industry.

279.  Plaintiffs and Class members were unaware, and could not reasonably discover on their own, that Honda's representations were false and misleading, or that it had omitted material facts relating to the Class Vehicles

280.  Honda had a duty to disclose, rather than conceal and suppress, the full scope and extent of the Paint Defect because:

- Honda had exclusive or far superior knowledge of the Paint Defect and concealment thereof. The facts regarding the Paint Defect and concealment thereof were known and/or accessible only to Honda;

- Honda knew that Plaintiffs and Class members did not know about,

or could not reasonably discover, the Paint Defect and concealment thereof; and

- Honda made representations and assurances about the qualities of the Class Vehicles, including statements about their quality, durability, and high resale value, that were misleading, deceptive, and incomplete without the disclosure of the fact that paint used on the Vehicles suffered from a systemic design and/or manufacturing defect.

281.  These omitted and concealed facts were material because a reasonable consumer would rely on them in deciding to purchase or lease the Class Vehicles, and because they substantially reduced the value of the Class Vehicles purchased or leased by Plaintiffs and Class members. Whether the Class Vehicles were defective, of sound quality, and durable, and whether Honda stood behind such Vehicles, would have been an important factor in Plaintiffs' and the Class members' decisions to purchase or lease the Vehicles.  Plaintiffs and Class members trusted Honda not to sell them vehicles that were defective and significantly overpriced.

282. Honda intentionally and actively concealed and suppressed these material facts to falsely assure consumers that their Class Vehicles were free from known defects, as represented by Honda and reasonably expected by consumers

283.  Plaintiffs and Class members were unaware of these omitted material facts and would have paid less for the Class Vehicles, or would not have purchased/leased them at all, if they had known of the concealed and suppressed facts.  Plaintiffs and Class members did not receive the benefit of their bargain due to Honda' fraudulent concealment.   Plaintiffs' and Class members' actions in purchasing the Class Vehicles were justified. Honda was in exclusive control of the material facts, and such facts were not known or reasonably knowable to the public, Plaintiffs, or Class members.

284. Plaintiffs and Class members relied to their detriment upon Honda's reputation, fraudulent misrepresentations, and material omissions regarding the quality, durability, and high resale value of the Class Vehicles.

285. As a direct and proximate result of Honda' deceit and fraudulent

concealment, including its intentional suppression of true facts, Plaintiffs and Class members suffered injury. They purchased and leased Class Vehicles that had a diminished value by reason of Honda's concealment of, and failure to disclose, the Paint Defect, among other damages.

286.  Accordingly, Honda is liable to Plaintiffs and the Class for their damages in an amount to be proven at trial.

287.  On information and belief, Honda has still  not made full and adequate disclosure and continues to defraud Plaintiffs and Class members. Honda also continues to conceal material information regarding the Paint Defect.

288.  Honda's acts were done deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' and the Class members' rights.  Honda's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## EIGHTH CLAIM

## UNJUST ENRICHMENT

289.  Plaintiffs reallege and incorporate by reference the allegations elsewhere in the Complaint as if set forth fully herein.

290.  Plaintiffs bring this claim on behalf of themselves and the National Class.

291.  "Although there are numerous permutations of the elements of the unjust enrichment cause of action in the various states, there are few real differences. In all states, the focus of an unjust enrichment claim is whether the defendant was unjustly enriched. At the core of each state's law are two fundamental elements—the defendant received a benefit from the plaintiff and it would be inequitable for the defendant to retain that benefit without compensating the plaintiff. The focus of the inquiry is the same in each state." *In re Mercedes-Benz Tele Aid Contract Litig*., 257 F.R.D. 46, 58 (D.N.J. Apr. 24, 2009) (quoting *Powers v. Lycoming Engines*, 245 F.R.D. 226, 231 (E.D. Pa. 2007)).

292.  Plaintiffs bring this claim as an alternative to the contractual warranty

claims asserted below and in the event that Plaintiffs prevail on their claims that any contract with Honda (including any express warranty) was fraudulently induced and/or Plaintiffs prevail in proving that the warranties cannot be enforced by Honda due to Honda having provided the warranties only after entering into a contract with a purchaser or lessor, or due to Honda's intentional and deceptive efforts to conceal the Paint Defect and avoid its warranty obligations.

293.  Honda has received hundreds of millions or more in revenue from the sale of the Class Vehicles between late 2012 and the present.

294.  This revenue was a benefit conferred upon Honda by Plaintiffs and Class members, individuals living across the United States.

295.  Honda manufactured, marketed, and sold defective Class Vehicles to Plaintiffs and Class members, while actively concealing the vehicles' known defects and touting their quality, durability, and high resale value.

296.  Honda benefitted from selling defective cars for more money than they were worth, at a profit, and Plaintiffs have overpaid for the cars and, in some instances, been forced to pay to (unsuccessfully) repair the Paint Defect.

297.  Plaintiffs and Class members elected to purchase or lease the Class Vehicles based on Honda's misrepresentations, deception, and omissions.  Honda knew and understood that it would (and did) receive a financial benefit, and voluntarily accepted the same, from Plaintiffs and Class members when they elected to purchase or lease the Class Vehicles.

298.  The Class Vehicles' defect, and Honda' concealment of the same, enriched Honda beyond its legal rights by securing through deceit and falsehood millions of dollars in revenues between late 2012 and the present.

299.  Therefore, because Honda will be unjustly enriched if it is allowed to retain the revenues obtained through falsehoods, deception, and misrepresentations, Plaintiffs and each Class member are entitled to recover the amount by which Honda was unjustly enriched at his or her expense.

300.   Accordingly, Plaintiffs, on behalf of themselves and each Class member, seek damages against Honda in the amounts by which it has been unjustly enriched at Plaintiffs' and each Class member's expense, and such other relief as this Court deems just and proper.

## JURY DEMAND

301. Plaintiffs demand a trial by jury on all issues.

## PRAYER FOR RELIEF

**WHEREFORE**, , Plaintiffs, individually and on behalf of the members of the Class, respectfully request that the Court certify the proposed Class, including designating the named Plaintiffs as representatives of the Class and their respective state classes and appointing the undersigned as Class Counsel, and the designation of any appropriate issue classes, under the applicable provisions of Fed. R. Civ. P. 23, and that the Court enter judgment in Plaintiffs' favor and against Honda including the following relief:

a) A declaration that any applicable statutes of limitations are tolled due to Honda's fraudulent concealment and that Honda is estopped from relying on any statutes of limitations in defense;

b) Restitution, compensatory damages, and costs for economic loss and out- of- pocket costs;

c) Punitive and exemplary damages under applicable law;

d) Reimbursement and compensation of the full purchase price for any replacement paint job purchased by a Plaintiff or Class member;

e) A determination that Honda is financially responsible for all  Class notices and the administration of Class relief;

f) Any applicable statutory or civil penalties;

g) An order requiring Honda to pay both pre-judgment and post-judgment interest on any amounts awarded;

h) An award of reasonable counsel fees, plus reimbursement of reasonable

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

costs, expenses, and disbursements, including reasonable allowances for the fees of experts;

i) Leave to amend this Class Action Complaint to conform to the evidence produced in discovery and at trial

j) Any such other and further relief the Court deems just and equitable.

Dated:  November 12, 2024          Respectfully submitted,

By:/s/ Daniel L. Keller
    Daniel L. Keller
    **KELLER, FISHBACK & JACKSON LLP**
    28720 Canwood Street, Suite 200
    Agoura Hills, CA 91301
    Telephone: (818) 342-7442
    Facsimile: (818) 342-7616
    Email: dkeller@kfjlegal.com

    Stephen J. Fearon, Jr. (subject to *pro hac vice*)
    Paul V. Sweeny (subject to *pro hac vice*)
    **SQUITIERI & FEARON, LLP**
    305 Broadway, 7th Floor
    New York, New NY 10007
    Telephone: (212) 421-6492
    Facsimile: (212) 421-6553
    Email: stephen@sfclasslaw.com
    Email: paul@sfclasslaw.com

    **Attorneys for Plaintiffs and the Proposed Class**